Rehearing en banc granted, July 28, 2008

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RICHMOND MEDICAL CENTER FOR
WOMEN; WILLIAM G. FITZHUGH,
M.D., on behalf of themselves, their
staffs, and their patients,
　　　　　　*Plaintiffs-Appellees,*

v.

MICHAEL N. HERRING, in his official
capacity as Commonwealth
Attorney for the City of Richmond;
WADE A. KIZER, in his official
capacity as Commonwealth
Attorney for the County of Henrico,
　　　　　*Defendants-Appellants.*

HORATIO R. STORER FOUNDATION,
INCORPORATED,
　　　*Amicus Supporting Appellants,*

and

PHYSICIANS FOR REPRODUCTIVE
CHOICE AND HEALTH; VANESSA E.
CULLINS, Vice President for Medical
Affairs, Planned Parenthood
Federation of America; FORTY-TWO
INDIVIDUAL PHYSICIANS,
　　　*Amici Supporting Appellees.*

No. 03-1821

RICHMOND MEDICAL CENTER FOR
WOMEN; WILLIAM G. FITZHUGH,
M.D., on behalf of themselves, their
staffs, and their patients,
                    *Plaintiffs-Appellees,*

                    v.

MICHAEL N. HERRING, in his official
capacity as Commonwealth
Attorney for the City of Richmond;
WADE A. KIZER, in his official
capacity as Commonwealth
Attorney for the County of Henrico,
                    *Defendants-Appellants.*

HORATIO R. STORER FOUNDATION,
INCORPORATED,
        *Amicus Supporting Appellants,*

                    and

PHYSICIANS FOR REPRODUCTIVE
CHOICE AND HEALTH; VANESSA E.
CULLINS, Vice President for Medical
Affairs, Planned Parenthood
Federation of America; FORTY-TWO
INDIVIDUAL PHYSICIANS,
                    *Amici Supporting Appellees.*

No. 04-1255

On Remand from the Supreme Court of the United States.

(S. Ct. No. 05-730)

Argued: November 1, 2007

Decided: May 20, 2008

Before NIEMEYER, MICHAEL, and MOTZ, Circuit Judges.

Affirmed by published opinion. Judge Michael wrote the majority opinion, in which Judge Motz joined. Judge Niemeyer wrote a dissenting opinion.

## COUNSEL

**ARGUED:** William Eugene Thro, Deputy State Solicitor, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellants. Stephanie Toti, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellees. **ON BRIEF:** Jerry W. Kilgore, Attorney General, Judith Williams Jagdmann, Deputy Attorney General, David E. Johnson, Deputy Attorney General, Edward M. Macon, Senior Assistant Attorney General, James C. Stuchell, Assistant Attorney General, Anthony P. Meredith, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL, Richmond, Virginia, for Appellants. Suzanne Novak, Priscilla J. Smith, CENTER FOR REPRODUCTIVE RIGHTS, New York, New York, for Appellees. James Bopp, Jr., Richard E. Coleson, Thomas J. Marzen, Jeffrey P. Gallant, BOPP, COLESON & BOSTROM, Terre Haute, Indiana, for Amicus Supporting Appellants. David S. Cohen, WOMEN'S LAW PROJECT, Philadelphia, Pennsylvania; Susan Frietsche, Stacey I. Young, WOMEN'S LAW PROJECT, Pittsburgh, Pennsylvania, for Amici Supporting Appellees.

## OPINION

MICHAEL, Circuit Judge:

We reconsider the constitutionality of a Virginia statute that outlaws what is termed "partial birth infanticide." Va. Code Ann. § 18.2-71.1 (the Virginia Act or the Act). Reconsideration is required in light of *Gonzales v. Carhart* (*Carhart II*), 550 U.S. ___, 127 S. Ct. 1610 (2007), which rejected a facial challenge to the federal partial birth

abortion statute prohibiting the intact dilation and evacuation (D&E) procedure. Critical to the Court's holding in *Carhart II* is the federal statute's requirement that a doctor intend at the outset to perform an intact D&E; according to the Court, this requirement of intent at the outset ensures that the federal statute does not impose criminal liability on a doctor who sets out to perform a standard D&E that by accident becomes an intact D&E. As a consequence, the federal statute does not prohibit — through fear of criminal liability — doctors from performing the standard D&E procedure, the procedure employed in the vast majority of (previability) second trimester abortions. In contrast, the Virginia Act has no provision requiring intent at the outset of the procedure. The Virginia Act thus imposes criminal liability on a doctor who sets out to perform a standard D&E that by accident becomes an intact D&E, thereby exposing all doctors who perform standard D&Es to prosecution, conviction, and imprisonment.

The dissent argues unconvincingly that the Virginia Act is constitutional because, "properly read," it has the same requirement of intent at the outset as the federal statute. *See post* at 44. The dissent fails to accept that the Virginia Act plainly delays the application of its intent requirement until the fetus has been "substantially expelled or extracted" intact. *See* Va. Code Ann. § 18.2-71.1.C. After that point, as the doctor takes any intentional step in completing the procedure that results in termination of the fetus, he commits the crime of "partial birth infanticide." He commits the crime even if he intended at the outset to perform a (lawful) standard D&E, and thus the fetus was substantially expelled or extracted intact by accident. Such a statute cannot stand under *Carhart II*, which requires as a prerequisite for criminal liability that a doctor intend at the outset to perform an intact D&E.

The Virginia Act is therefore unconstitutional because it imposes an undue burden on a woman's right to obtain an abortion. The district court's summary judgment, to the extent it declared the statute invalid on this ground, is affirmed.

## I.

### A.

Under the Virginia Act, passed in 2003, "[a]ny person who knowingly performs partial birth infanticide . . . is guilty of a Class 4 fel-

ony." Va. Code Ann. § 18.2-71.1. A class 4 felony in Virginia is punishable by a prison term of up to ten years and a fine of up to $100,000. *Id.* § 18.2-10. The Act defines "partial birth infanticide" as

> any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.

*Id.* § 18.2-71.1.B. A "human infant who has been born alive" is defined as

> a product of human conception that has been completely or substantially expelled or extracted from its mother, regardless of the duration of pregnancy, which after such expulsion or extraction breathes or shows any other evidence of life such as beating of the heart, pulsation of the umbilical cord, or definite movement of voluntary muscles, whether or not the umbilical cord has been cut or the placenta is attached.

*Id.* § 18.2-71.1.C. Finally, "'substantially expelled or extracted from the mother' means in the case of a headfirst presentation, the infant's entire head is outside the body of the mother, or, in the case of breech presentation, any part of the infant's trunk past the navel is outside the body of the mother." *Id.* § 18.2-71.1.D. (We refer to the positions of the fetus described in this definition as "anatomical landmarks.")

The Virginia Act excludes certain procedures from the definition of "partial birth infanticide," including (1) "the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother," and (2) "completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered." *Id.* § 18.2-71.1.B. The Act does not include an exception to preserve a woman's health. It does have a life — or "prevent[ion of] death" — exception:

This section shall not prohibit the use by a physician of any procedure that, in reasonable medical judgment, is necessary to prevent the death of the mother, so long as the physician takes every medically reasonable step, consistent with such procedure, to preserve the life and health of the infant. A procedure shall not be deemed necessary to prevent the death of the mother if completing the delivery of the living infant would prevent the death of the mother.

*Id.* § 18.2-71.1.E.

Plaintiff William G. Fitzhugh, M.D., is a board certified obstetrician and gynecologist who is licensed to practice medicine in Virginia. Dr. Fitzhugh performs previability abortions through twenty weeks of pregnancy. He performs some abortions on the premises of plaintiff Richmond Medical Center for Women (RMCW) where he is Medical Director. Dr. Fitzhugh uses several different abortion techniques in his practice. For second trimester abortions, he usually employs the dilation and evacuation (D&E) method. Dr. Fitzhugh asserts that the Act exposes a doctor to criminal liability every time he attempts a D&E abortion, because this procedure always poses the risk of unintentional intact delivery of the fetus to one of the anatomical landmarks specified in the Act.

Shortly before the Act's July 1, 2003, effective date, RMCW and Dr. Fitzhugh sued two Commonwealth Attorneys (the Commonwealth) in district court, challenging the Virginia Act as unconstitutional on its face and seeking to enjoin its enforcement. Ultimately, the district court granted the plaintiffs summary judgment and a permanent injunction. The court concluded that the Act was unconstitutional for five independent reasons: (1) the Act lacks an exception to protect a woman's health; (2) it imposes an undue burden on a woman's right to choose an abortion because "[t]he plain language of the Act bans pre-viability D&Es and would cause those who perform such D&Es to fear prosecution, conviction and imprisonment"; (3) its exception to protect a woman's life is inadequate; (4) it bans the safe completion of miscarriages; and (5) it is unconstitutionally vague. *See Richmond Med. Ctr. for Women v. Hicks*, 301 F. Supp. 2d 499, 513-17 (E.D. Va. 2004).

The Commonwealth appealed to this court, and we (by a divided panel) affirmed the district court on the ground that the Act lacked an exception to protect a woman's health. *Richmond Med. Ctr. for Women v. Hicks*, 409 F.3d 619 (4th Cir. 2005). The petition for rehearing en banc was denied. *Richmond Med. Ctr. for Women v. Hicks*, 422 F.3d 160 (4th Cir. 2005). The Supreme Court later granted certiorari, vacated our judgment, and remanded for further consideration in light of its recent decision in *Gonzalez v. Carhart*, 550 U.S. ___, 127 S. Ct. 1610 (2007). *Herring v. Richmond Med. Ctr. for Women*, ___ U.S. ___, 127 S. Ct. 2094 (2007).

B.

The range of abortion procedures have been extensively described in several Supreme Court opinions. *See, e.g.*, *Carhart II*, 127 S. Ct. at 1620-23; *Stenberg v. Carhart* (*Carhart I*), 530 U.S. 914, 923-29 (2000). Here, we briefly describe only those procedures that are relevant to the plaintiffs' challenge to the Virginia Act. The descriptions are based on undisputed evidence in the summary judgment record, taking into account, except where noted, evidence excluded by the district court. The descriptions are also consistent with those set forth in *Carhart I* and *Carhart II*.

D&E (dilation and evacuation) is by far the most common method of previability second trimester abortion, used approximately ninety-five percent of the time. In this procedure the doctor dilates the woman's cervix and uses suction and forceps to remove the fetus. The doctor also uses instruments to hold the vagina open and to gain access to the cervix and uterus. As the doctor uses forceps to pull the fetus out of the cervix during a D&E, friction usually causes parts of the fetus to break off or disarticulate. *See Carhart II*, 127 S. Ct. at 1621; *Carhart I*, 530 U.S. at 925-26. As a result of disarticulation the fetus is removed in pieces. Throughout the process, the fetus may show signs of life, such as a heartbeat, although disarticulation ultimately causes fetal demise.

A variation of the standard D&E procedure, termed "intact D&E" or "dilation and extraction" (D&X), occurs when the doctor removes the fetus intact or largely intact. *Carhart II*, 127 S. Ct. at 1621-23; *Carhart I*, 530 U.S. at 927-29. Because "[t]he medical community has

not reached unanimity on the appropriate name for this D&E variation," we will refer to it as "intact D&E," as does the Supreme Court. *Carhart II*, 127 S. Ct. at 1621. A doctor intending to perform an intact D&E uses certain methods, such as serially dilating the cervix or rotating the fetus as it is pulled out of the uterus, to increase the likelihood of intact delivery. *See Carhart II*, 127 S. Ct. at 1621-22. In an intact D&E, as generally described, the fetal skull is typically too large to pass through the cervix, and the doctor compresses or collapses the skull to complete the abortion. *See Carhart II*, 127 S. Ct. at 1622-23; *Carhart I*, 530 U.S. at 925, 927.

As the Supreme Court has recognized and the Commonwealth does not dispute, in a small fraction of cases a doctor performing a standard D&E procedure unintentionally (or accidentally) delivers a fetus intact or substantially intact. *See* Appellants' Supplemental Reply Br. 6 (Commonwealth stating that "an *accidental* intact D&E occurs 'in a *small fraction* of the overall number of D&E abortions'" (quoting *Carhart II*, 127 S. Ct. at 1632) (emphasis added by Commonwealth)); *see also Carhart I*, 530 U.S. 925-26. The potential for an accidental intact delivery of a fetus to an anatomical landmark during a standard D&E is grounded on two undisputed factual premises. First, it is possible for a doctor to remove a fetus to an anatomical landmark during a D&E. *See Carhart II*, 127 S. Ct. at 1629 (stating that in an intact D&E "a doctor delivers the fetus until its head lodges in the cervix, which is usually past the anatomical landmark for a breech presentation"). Second, doctors are unable to predict at the outset of the standard D&E procedure when, or even whether, a fetus will disarticulate during evacuation. As Dr. Fitzhugh and experts for both sides in this case explained, several factors beyond the doctor's control influence fetal disarticulation, including the precise level of cervical dilation, the condition of the uterus and the cervix, the size and orientation of the fetus, and fetal fragility. While the fetus usually disarticulates as it is pulled through the cervix, on occasion the factors just noted may cause it to emerge intact or substantially intact. Dr. Fitzhugh does not intentionally perform intact D&Es; however, when he performs standard D&Es, a small fraction of those cases result in intact or substantially intact extraction of the fetus prior to completion of the abortion.

Once a fetus emerges to an anatomical landmark despite the doctor's intent to perform a standard D&E, steps must be taken to com-

plete the abortion. Thus, in a breech presentation, after the fetus reaches or passes the navel (an anatomical landmark), the doctor will continue to pull to extract the fetus. This force and traction usually causes the fetus to disarticulate, leading to its demise. In addition, the fetal skull can become lodged in the cervix, as it would in an intentional intact D&E. In this situation the doctor will have to compress or collapse the fetal skull to remove it through the cervix and complete the abortion, another act that causes fetal demise.[1]

---

[1]Harlan Giles, M.D., one of the Commonwealth's experts, testified that the appropriate procedure for dislodging a fetal skull during a D&E is to administer terbutaline, nitroglycerin, Fluothane, or halothane. According to Dr. Giles, these medications cause additional cervical dilation, which should allow the fetus to be removed intact. The district court excluded this testimony based in part on Dr. Giles's admitted lack of knowledge about the use of this technique in the D&E procedure. *See Richmond Med. Ctr. for Women*, 301 F. Supp. at 509-12 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993)). As the district court noted, Dr. Giles stated that he could not recall ever using this technique during a D&E. *See id.* at 509. In addition, Dr. Giles admitted that he (1) did not know of any doctors who used the technique in D&Es, (2) was not aware of any studies on its safety or efficacy, and (3) was not aware of any medical literature that suggested the use of these drugs to dislodge a fetal skull during a D&E. *See id.* at 509-10. Dr. Giles also suggested two other methods for dislodging a fetal skull during a D&E: (1) wait a couple of hours for the cervix to relax and make another attempt to remove the fetus intact or (2) compress the skull with forceps. Again, as noted by the district court, he was unable to recall ever having used these two methods during a D&E. *See id.* (Dr. Giles performs mainly induction abortions in the second trimester, and he has only performed one D&E since 1998.)

Under Federal Rule of Evidence Rule 702 expert testimony must be both relevant and reliable. *Daubert*, 509 U.S. at 589. To satisfy these requirements, the testimony must be based on "more than subjective belief or unsupported speculation." *Id.* at 590. Furthermore, a proffered expert's professional qualifications are insufficient to support his testimony; he must also have "sufficient specialized knowledge to assist the jurors in deciding *the particular issues in the case*." *Kumho Tire Co.*, 526 U.S. at 156 (emphasis added) (internal quotation marks omitted). As the district court concluded, although Dr. Giles has credentials and experi-

## II.

We now proceed to reconsider the summary judgment rendered by the district court in favor of RMCW and Dr. Fitzhugh. We review the grant of summary judgment de novo. *See Long v. Dunlop Sports Group Ams., Inc.*, 506 F.3d 299, 301 (4th Cir. 2007). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Our reconsideration is undertaken in light of *Carhart II*, as the Supreme Court has instructed. In *Carhart II* the Court considered the constitutional limits on the regulation of abortion procedures and held that the federal Partial-Birth Abortion Ban Act of 2003 (the Federal Act), 18 U.S.C. § 1531, is, "as a facial matter," constitutional. 127 S. Ct. at 1639. The Court began its analysis by quoting the summary of governing principles set forth in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992):

> "It must be stated at the outset and with clarity that [the] essential holding [of *Roe v. Wade*, 410 U.S. 113 (1973)], the holding we reaffirm, has three parts. First is a recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State. Before viability, the State's interests are not strong

ence as an obstetrician/gynecologist and perinatologist, he does not have specialized experience or knowledge about the appropriate procedures for dislodging a fetal skull during a D&E abortion. *See Richmond Med. Ctr. for Women*, 301 F. Supp. 2d at 509-12. Because the district court reasonably determined that Dr. Giles's testimony on this discrete subject was unsupported and unreliable, *id.* at 511-12, it did not abuse its discretion in excluding it. *See Kumho Tire Co.*, 526 U.S. at 158. (It is unnecessary for us to decide whether the district court erred in excluding the remainder of Dr. Giles's evidence as well as certain other evidence offered by the Commonwealth. This excluded evidence does not create any issue of material fact that is relevant to our decision today.)

enough to support a prohibition of abortion or the imposition of a substantial obstacle to the woman's effective right to elect the procedure. Second is a confirmation of the State's power to restrict abortions after fetal viability, if the law contains exceptions for pregnancies which endanger the woman's life or health. And third is the principle that the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child. These principles do not contradict one another; and we adhere to each."

*Carhart II*, 127 S. Ct. at 1626 (quoting *Casey*, 505 U.S. at 846 (opinion of the Court)). In *Carhart II* the Court also adhered to *Carhart I*'s central holding: a law that effectively prohibits "[standard] D&E procedures, the most commonly used method for performing previability second trimester abortions," imposes "an undue burden upon a woman's right to make an abortion decision," in violation of the Constitution. *Carhart I*, 530 U.S. at 945-46; *see Carhart II*, 127 S. Ct. at 1619, 1629-31.

After reviewing the text of the Federal Act, the *Carhart II* Court concluded that the Federal Act "prohibits a doctor from intentionally performing an intact D&E," but "does not prohibit the [standard] D&E procedure in which the fetus is removed in parts." *Carhart II*, 127 S. Ct. at 1629. The Court's constitutional analysis proceeded as follows. First, the Court considered whether the Federal Act was void for vagueness or overly broad. Here, the Court was guided by the Federal Act's "defin[ition of] the unlawful abortion in explicit terms." *Id.* at 1627. Specifically, to violate the Federal Act, a doctor must (1) vaginally deliver a living fetus; (2) deliver the fetus to a clearly described anatomical landmark; and (3) "perform an 'overt act, other than completion of delivery, that kills the partially delivered living fetus,'" *id.* at 1627 (quoting 18 U.S.C. § 1531(b)(1)(B)). *Id.* at 1627-28. Further, the Court emphasized that the Federal Act contains intent requirements "concerning all the actions involved in the prohibited abortion." *Id.* at 1628. Thus, the Federal Act requires that the doctor (1) "deliberately and intentionally" deliver the fetus to a specific anatomical landmark (2) "for the purpose of performing an overt act that the [doctor] knows will kill [it]." *Carhart II*, 127 S. Ct. at 1628 (quoting 18 U.S.C. § 1531(b)(1)(A)) (alteration in original). Through this

precise definition the Federal Act makes it a crime for a doctor to intentionally set out to perform and then to perform an intact D&E abortion.

In rejecting the vagueness challenge, the Court concluded that the Federal Act's intent requirements provide doctors with a clear description of the prohibited conduct and prosecutors with objective criteria that serve to limit their discretion. 127 S. Ct. at 1628-29. The Court then concluded that the Federal Act was not overly broad because it only "prohibits a doctor from intentionally performing an intact D&E." *Id.* at 1629. Again, the Court found that the Federal Act's reach was limited by the features of the unlawful abortion enumerated above. *Id.* at 1629-32. Specifically, the "intent requirements . . . preclude liability from attaching to an accidental intact D&E." *Id.* at 1631. Thus, a doctor does not run the risk of violating the Federal Act when he sets out to perform a standard D&E, even though the fetus might be delivered to one of the anatomical landmarks "by accident or inadvertence." *Id.* at 1628. As a result, the scope of the Federal Act is carefully limited to prohibit intentional intact D&E, thereby allowing access to the more widely used standard D&E procedure. *Id.* at 1629-32.

Second, the Court considered whether the Federal Act was passed with the impermissible purpose of placing "'a substantial obstacle in the path of a woman seeking an abortion before the fetus attains viability.'" *Id.* at 1632 (quoting *Casey*, 505 U.S. at 878 (plurality opinion)). The Court determined that Congress, in carefully targeting its restriction to the intact D&E, was engaging in a legitimate use of its authority to "regulat[e] the medical profession in order to promote respect for life, including life of the unborn." *Id.* at 1633.

Third, the Court considered whether the Federal Act imposed a substantial obstacle to late-term, previability abortions by failing to include an exception to preserve the health of the woman. *Id.* at 1635-38. The Federal Act contains a life exception, 18 U.S.C. § 1531(a), but not a health exception. The Court noted that "whether the Act creates significant health risks for women [was] a contested factual question." *Id.* at 1635. As a result, the Court held, "[t]he [Federal] Act is not invalid on its face [because] there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health,

given the availability of other abortion procedures," such as the standard D&E, "that are considered to be safe alternatives." *Id.* at 1638. In the face of this medical uncertainty, only as-applied challenges to the Federal Act's lack of a health exception may be pursued. *Id.* at 1638-39.

With this overview of *Carhart II* in mind, we turn to the parties' arguments with respect to whether the Virginia Act is constitutional in light of that decision and whether a facial challenge is appropriate here.

### III.

RMCW argues, and the district court held, that the Virginia Act creates an undue burden on a woman's constitutional right to choose an abortion in the second trimester, prior to fetal viability, because the Act effectively prohibits the standard D&E procedure. *See Richmond Med. Ctr. for Women*, 301 F. Supp. 2d at 515. The Commonwealth responds that summary judgment cannot be affirmed on this ground because "[t]he Virginia Act is substantively identical to the federal statue upheld in [*Carhart II*]." Appellants' Supplemental Br. 12. We disagree with the Commonwealth. The Virginia Act lacks the intent and distinct overt act requirements that were central to the Supreme Court's decision to uphold the Federal Act in *Carhart II*. Unlike the Federal Act, the Virginia Act subjects all doctors who perform standard D&Es to potential criminal liability, thereby imposing an unconstitutional burden on a woman's right to choose a previability second trimester abortion.

### A.

The Virginia Act criminalizes "partial birth infanticide," a new term. Va. Code Ann. § 18.2-71.1.A. This crime occurs when (1) a fetus "has been . . . substantially expelled or extracted from its mother" (that is, has emerged to an anatomical landmark) while exhibiting "evidence of life," (2) thereafter, but before the fetus is "completely extracted or expelled," a person "knowingly performs" "any deliberate act that . . . is intended to kill" the fetus, and (3) the deliberate act "does kill" the fetus, "regardless of whether death

occurs before or after extraction or expulsion." Va. Code Ann. § 18.2-71.1.A-D.

Like the Federal Act, the Virginia Act specifies anatomical land-marks (the fetal head or the trunk past the navel must be "outside the body of the mother") that establish the point at which the Act applies.[2] *Id.* § 18.2-71.1.D; 18 U.S.C. § 1531(b)(1)(A). Apart from this similar-ity, the two statutes have key differences.

First, the Federal Act "contains scienter requirements concerning all the actions involved in the prohibited abortion," including both a requirement that the doctor intentionally deliver the fetus to an ana-tomical landmark *and* a requirement that this delivery be for the pur-pose of performing the overt act that the doctor knows will cause fetal demise. *Carhart II*, 127 S. Ct. at 1628; *see* 18 U.S.C. § 1531(b)(1)(A). As the Supreme Court observed, under the Federal Act "[i]f either intent is absent, no crime has occurred." *Carhart II*, 127 S. Ct. at 1628. These intent requirements were crucial to *Carhart II*'s holding that the Federal Act does not prohibit standard D&E and is thus con-stitutional. *Id.* at 1629. In evaluating the overbreadth challenge, the Court explained the significance of the intent requirements: "The Act's intent requirements . . . limit its reach to those physicians who carry out the intact D&E after intending to undertake both [the deliv-ery to an anatomical landmark and the distinct overt act] steps at the outset." *Id.* The Court rejected the respondents' argument that the Federal Act imposes criminal liability on doctors who complete an abortion after accidental intact delivery to an anatomical landmark. According to the Court, this argument failed to "take account of the Act's intent requirements, which preclude liability from attaching to an accidental intact D&E." *Id.* at 1631.

The Virginia Act lacks any such protection. Instead, the Act's only intent requirement relates to the overt act: the doctor is prohibited from "knowingly perform[ing] . . . any deliberate act that . . . is intended to kill [and does kill] a human infant who has been born alive, but who has not been completely extracted or expelled from its mother." Va. Code Ann. § 18.2-71.1.A, B. In contrast to the Federal

---

[2]We understand "outside the body of the mother" to mean beyond the vaginal opening.

Act, the Virginia Act omits any mention of the doctor's intent *at the commencement* of the procedure, using the phrase "*has been* born alive" to describe delivery. Va. Code Ann. § 18.2-71.1.B (emphasis added). *Compare* 18 U.S.C. § 1531(b)(1)(A) (requiring that the doctor "deliberately and intentionally vaginally deliver[ ] a living fetus," thus focusing on intent at the outset). The Virginia Act's use of the passive voice in "has been born alive" makes it clear that the statute does not require that the doctor intend at the outset to perform an intact D&E for a violation to occur.

The Virginia Act's requirement that a doctor "*knowingly* perform[ ] partial birth infanticide" does not remedy the problem. The term "partial birth infanticide" has a specific definition: to perform "any deliberate act that . . . is intended to kill a human infant who has been born alive." Va. Code Ann. § 18.2-71.1.B. The use of "has been born alive," which describes an event that has already occurred, means that partial birth infanticide, as defined by the Act, does not occur until *after* delivery to an anatomical landmark, at the point the doctor commits the deliberate act. *See post* at 44-45. The knowledge requirement thus only attaches to commission of the deliberate act (that is, the commission of the partial birth infanticide); the knowledge requirement does not attach to the commencement of the abortion. In sum, the Virginia Act reaches doctors who intend to perform a standard D&E, but who nonetheless accidentally deliver the fetus to an anatomical landmark, and who must perform a deliberate act that causes fetal demise in order to complete removal.

Second, the Virginia Act differs from the Federal Act because, although both statutes require that the doctor perform a deliberate act to cause fetal demise after delivery to an anatomical landmark, the Federal Act requires that this act be *distinct* from completing delivery. The Virginia Act lacks such a distinction. *Compare* Va. Code Ann. § 18.2-71.1.B (requiring "any deliberate act") *with* 18 U.S.C. § 1531(b)(1)(B) (requiring an "overt act, other than the completion of delivery"). "This distinction matters because, unlike intact D&E, standard D&E does not involve a delivery followed by a fatal act." *Carhart II*, 127 S. Ct. at 1631. The Federal Act's requirement of an overt act distinct from completion of delivery excludes standard D&Es in which fetal demise results from disarticulation that occurs during the delivery. The Federal Act, in other words, requires an additional act

such as compressing the fetal skull before liability can attach. In contrast, a doctor is liable under the Virginia Act for completing the evacuation of a fetus after it has emerged substantially intact if disarticulation (causing fetal demise) occurs during this process. *See Carhart I*, 530 U.S. at 939, 943-44 (striking down abortion ban because it failed to distinguish between delivery and the act that terminated the fetus).

Notwithstanding the dissent's contention, the Virginia Act's requirement that a doctor "*intend*[ ] to kill a human infant" does not save a doctor from liability when the completion of delivery causes fetal demise. *Post* at 45 (quoting Va. Code Ann. § 18.2-71.1.B). "[I]ntent to cause a result may sometimes be inferred if a person 'knows that that result is practically certain to follow from his conduct.'" *Carhart II*, 127 S. Ct. at 1632 (quoting 1 LaFave § 5.2(a), at 341). Because the record establishes that completing delivery after removal to an anatomical landmark usually results in fetal demise, intent would be inferred onto the doctor when this event occurs. The doctor would thus violate the Virginia Act.

The absence of the intent and distinct overt act requirements in the Virginia Act expand its reach substantially beyond that of the Federal Act. Every time a doctor intends at the outset to perform a standard D&E, he runs the real risk of accidentally delivering an intact fetus to an anatomical landmark. As the Supreme Court recognizes, and the record in this case confirms, an accidental intact D&E occurs "in a small fraction of the overall number of D&E abortions." *Carhart II*, 127 S. Ct. at 1632. The Virginia Act imposes criminal liability in all such cases because a doctor faced with an accidental intact D&E must take steps to complete the abortion. He completes the abortion, in the case of a breech presentation, by continuing to pull (or apply traction) to extract the fetus, which usually causes disarticulation and fetal demise. In addition, as traction is applied, the fetal skull may become lodged in the cervix; in that case the doctor compresses the skull, which also causes fetal demise. The Virginia Act imposes criminal liability for either of these acts that terminate the fetus, and it does so even though the doctor intended at the outset to perform the standard D&E procedure.

B.

The dissent argues that three exceptions in the Virginia Act protect doctors who perform standard D&Es even if accidental intact delivery results, thereby rendering the Act constitutional. An examination of the exceptions reveals, however, that they do not save the Act.

First, the dissent suggests that "the Virginia Act's explicit exemption of [the standard D&E] procedure provides the same protection as the Federal Act's scienter requirement," which eliminates liability for doctors performing standard D&Es. *Post* at 41. But the dissent fails to recognize that the Virginia Act provides a definition of the conduct the D&E exception covers: "the [D&E] abortion procedure *involving dismemberment of the fetus prior to removal from the body of the mother*." Va. Code Ann. § 18.2-71.1.B(iii) (emphasis added). This definition, which only covers the D&E procedure in this limited circumstance, does not provide a safe harbor for doctors who face accidental intact D&Es.

As an initial matter, the exception only applies to the act of dismemberment.[3] The exception would never cover the situation where a doctor accidentally delivers a fetus to an anatomical landmark and the fetal skull becomes lodged in the cervix, forcing the doctor to compress the skull to complete the abortion. Liability would always attach in this circumstance, effectively prohibiting doctors from performing standard D&Es.

Furthermore, the Act's D&E exception would not protect a doctor when the fetus accidentally emerges to an anatomical landmark and the fetus disarticulates as the doctor completes delivery. Again, the exception covers a D&E "involving dismemberment of the fetus prior to *removal* from the body of the mother." *Id.* § 18.2-71.1.B (emphasis added). The Act does not define the word "removal," but its standard dictionary definition is "the act or process of removing : the fact of being removed." Merriam-Webster's Collegiate Dictionary 1053 (11th ed. 2003). With the meaning of "removal" taken into account, the exception applies only to a "[D&E] procedure involving dismem-

---

[3]For the purpose of this discussion, we assume that the terms "dismemberment" and "disarticulation" may be used interchangeably.

berment of the fetus prior to [the process of removing it] from the body of the mother." Va. Code Ann. § 18.2-71.1.B.

The process of removing the fetus *from the body of the mother* begins when the doctor extracts any portion of the fetus through the vaginal opening. Thus, the exception would cover the D&E procedure where the fetus disarticulates before the doctor begins removing it through the vaginal opening. As a result, the Act would not criminalize the typical standard D&E where the doctor evacuates the fetus "piece by piece," a process that often takes "10 to 15 passes . . . to evacuate the fetus in its entirety." *Carhart II*, 127 S. Ct. at 1621. But the Virginia Act would still make it a crime when a fetus first disarticulates *after* it accidentally emerges intact to an anatomical landmark. In that case the fetus would not be dismembered "*prior to* removal from the body of the mother"; instead, dismemberment would begin *after* intact removal of the fetus to a landmark. Va. Code Ann. § 18.2-71.1.B (emphasis added). As the Commonwealth stated at oral argument, a doctor "would violate the Virginia Act" if "the child had emerged intact or largely intact . . . [and] it is necessary to dismember the child."

The dissent nonetheless argues that the language in the D&E exception is identical to the language used by the Supreme Court to describe the full range of standard D&Es, and thus the exception excludes all standard D&Es from liability. *Post* at 42 n.1. The dissent is mistaken. The Supreme Court describes standard D&E, which is not prohibited by the Federal Act, as a procedure "in which the fetus is removed in parts." *Carhart II*, 127 S. Ct. at 1629. The Court's description encompasses D&Es in which disarticulation occurs either before or after the fetus reaches an anatomical landmark. In contrast, the Virginia Act limits its exception to D&Es in which disarticulation occurs "*prior to* removal" to an anatomical landmark. Va. Code Ann. § 18.2-71.1.B. Thus, the D&E exception does not protect from liability a doctor who accidentally delivers a fetus to an anatomical landmark and thereafter completes delivery that results in disarticulation and fetal demise.

Second, the dissent and the Commonwealth argue that the Virginia Act's life exception, Va. Code Ann. § 18.2-71.1.E, sufficiently limits liability because a woman's life might be endangered if the fetal skull

becomes caught in her cervix. In that case, the argument goes, the doctor would be allowed to compress the fetal skull to save the woman's life under the Act. This argument does not solve the over-breadth problem because it is based on a misunderstanding of the scope of the life exception. Applying the life exception in the manner suggested would render the Virginia Act largely meaningless by permitting the very procedure the Act was meant to prohibit: an intact D&E where, after a substantially intact delivery, the doctor must compress the fetal skull to remove the fetus. In other words, because the Act's prohibition does not apply until after delivery to an anatomical landmark, a doctor would be allowed to deliver (intentionally or unintentionally) a fetus until its skull becomes lodged; at this point both the Act's prohibition and its life exception would begin to apply; and the life exception would immediately cancel out the prohibition, allowing the doctor to deliberately collapse the skull to complete the abortion. This simply cannot be the purpose of the exception.

The dissent argues that the life exception would not cancel out the prohibition when the fetal skull becomes lodged. *Post* at 50-51. The dissent initially contends that the Act implicitly requires that a doctor must intend to deliver the fetus intact "from the commencement of the procedure." *Post* at 51. According to the dissent, the life exception thus "cannot prevent criminal liability from attaching" to a doctor performing a prohibited abortion: the doctor would necessarily intend to perform an intact D&E from the outset, which conflicts with the exception's requirement that the doctor work to preserve the life of the fetus. *Id.* at 51. This argument fails because, as we have explained, the Act's intent requirement only attaches after the fetus has been delivered to an anatomical landmark, so it does not distinguish between doctors who intend at the outset to perform standard D&Es and those who intend at the outset to perform intact D&Es. *See supra* 14-15; *see also infra* at 22-23. Because the Act does not make this distinction, the life exception applies to both sets of doctors; and, under the dissent's interpretation, the exception would eliminate liability for *all* doctors who must collapse the fetal skull, thereby undermining the Act's prohibition. The dissent next argues that collapse of the fetal skull would only be permitted if the doctor first "makes reasonable efforts — whatever those encompass — to preserve the health and life of the fetus." *Post* at 51. But the record establishes that when the fetal skull becomes lodged in the cervix, the doctor must collapse

the skull to complete the procedure.[4] Because such a step is an essential part of the typical intact D&E, the life exception — applied as the dissent suggests — would exempt the intact D&E, thereby undermining the Act's prohibition. Finally, neither the Commonwealth nor the dissent contend that the life exception would apply when a doctor's completion of delivery results in disarticulation after the fetus accidentally reaches an anatomical landmark.

Third, the dissent argues that the exception for "completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered," Va. Code Ann. § 18.2-71.1.B(iv), makes it unnecessary for the Act to include a distinct overt act requirement. Under this exception, according to the dissent, a doctor can not be liable for disarticulation that occurs during the delivery process. To begin with, even the dissent does not argue that this exception protects a doctor who must collapse the fetal skull after it becomes lodged in the cervix. Furthermore, this exception's language does not support the dissent's reading. The phrase "completing delivery of a living human infant and severing the umbilical cord" indicates that the fetus must be living and intact at the *completion* of delivery. Thus, an act (such as disarticulation) that causes fetal demise can not occur *during* delivery for the exception to apply. This conclusion is buttressed by the fact that neither the dissent nor the Commonwealth argue that collapsing the fetal skull would fall under the exception. If the exception only requires that the fetus be living at some point during delivery, rather than at the *end* of delivery, the exception would cover the situation where the fetus showed signs of life until the doctor collapsed its skull. Under the dissent's interpretation, collapsing the fetal skull to make extraction through the cervix possible would be an act (like disarticulation) involved in "completing the delivery of a living human infant," and thus would be covered by the exception.

In addition, the exception in § 18.2-71.1.B(iv) uses the conjunctive "and," requiring *both* the completion of delivery of a "living human

---

[4]The dissent relies on the testimony of Dr. Giles to dispute this point. *See post* at 51. As we have discussed above, the district court did not abuse its discretion in excluding as unreliable Dr. Giles's opinion regarding the methods for extracting a lodged fetal skull. *Supra* at 9-10 n.1.

infant" *and* the (post-delivery) severing of the umbilical cord. Thus, even if the fetus continues to show signs of life after disarticulating during delivery (thus qualifying as a "living human infant" post-delivery), the exception still would not apply unless the doctor *also* severs the umbilical cord post-delivery. But according to the record, the umbilical cord often disarticulates during the delivery process, thus rendering it unnecessary for the doctor to sever it at the end of the process as required for the exception to apply. On the other hand, even if the umbilical cord remains attached after delivery, the exception would not apply if the fetus no longer shows signs of life. Of course, the fetus often will expire *and* its umbilical cord will disarticulate prior to completion of delivery when the extraction process causes disarticulation, thus making the exception doubly inapplicable. The exception's terms thus reveal a specific purpose: the exception ensures that doctors will not face liability for committing the deliberate act of severing the umbilical cord after completely delivering a living infant. In short, the exception protects obstetricians who deliver living infants, not doctors who perform abortions.

In sum, the exceptions in the Act only protect a doctor in certain limited circumstances, and they do not exempt from liability a doctor performing a standard D&E who accidentally delivers a fetus to an anatomical landmark when the completion of delivery (through disarticulation or collapse of the fetal skull) results in fetal demise.

## C.

The dissent makes four additional arguments that also conflict with the plain language of the Virginia Act.

First, the dissent insists that we must read the Act to include an intent requirement to fulfill the Act's intended purpose. The dissent's argument is as follows: *Carhart II* states that "[t]he difference between the intact D&E abortion procedure and the standard D&E abortion procedure depends on the intent and approach of the doctor in *commencing* the delivery and the degree of dilation sought to be achieved." *Post* at 42. Because (according to the dissent) "partial birth infanticide" is simply another name for intact D&E or "partial birth abortion," we should interpret the Act to prohibit *intentional* intact delivery in order to fulfill the statutory purpose. *Id.*; *see id.* at 36

(describing intact D&E, "partial birth infanticide," and "partial-birth abortion" as different terms for the same conduct); *id.* at 39 (declaring that the Act "was intended to prohibit only partial birth abortions").

The dissent's central premise in this argument — that partial birth infanticide is the exact equivalent of intact D&E — lacks support in the text of the Act. The dissent claims to find support in the D&E exception, arguing that this exception exempts all standard D&Es from the reach of the Act. *See post* at 43. As we have explained, however, the D&E exception only exempts some standard D&Es from the Act; it does not protect doctors who are faced with accidental intact delivery of the fetus during a standard D&E. *See supra* at 17-19. Thus, the terms of the exception do not support the dissent's conclusion that all standard D&Es are exempted from the Virginia Act, nor its conclusion that partial birth infanticide is the same procedure as the intact D&E prohibited by the Federal Act. The Virginia legislature chose to create — and then define — an entirely new legal term to describe a crime; this is *not* a term used by the medical community or the Federal Act. In fact, the Commonwealth explains that partial birth infanticide prohibits conduct other than intact D&E, including, for example, the murder of a partially delivered baby by a parent. Appellants' Br. 14. We (like the officials who enforce the Act) must look to the language of the statute to determine the legislature's intent. Our statutory analysis always begins with the statute's express words; this approach is especially important when, as here, the statute coins a new term. Any ambiguity would, of course, be resolved in favor of constitutionality, but here the Act's terms are clear. As explained above, the Act criminalizes "knowingly perform[ing] partial birth infanticide," which it defines as "any deliberate act that is intended to kill the fetus" after it "has been born alive." The Act thus only imposes an intent requirement *after* delivery to an anatomical landmark. Under the Act's terms, the doctor's "intent at the outset" is simply irrelevant to liability under the Virginia Act. *Post* at 43 (citing *Carhart II*, 127 S. Ct. at 1631). Thus, the Virginia Act's clear terms, which must control our analysis, define partial birth infanticide as different conduct than the intact D&E prohibited by the Federal Act.

Once it is understood that the dissent's central premise — that the Virginia Act is really intended to criminalize the same conduct as the

Federal Act — is foreclosed by the Act's express terms, the remainder of the dissent's argument supports our conclusion. As the dissent explains, *Carhart II* established that "the intent and approach of the doctor in *commencing* the delivery" is essential in distinguishing intact D&E (which may be prohibited) from standard D&E (which may not). *Post* at 43. The Act's express terms do not require that a doctor intend to conduct an intact D&E at the commencement of delivery. *See supra* at 14-15. Under *Carhart II*'s determination that intent at commencement is key in distinguishing the two procedures, it is clear that the Virginia Act's prohibition reaches standard D&Es, making it unconstitutionally broad.

Because the Act does not have an intent requirement for the commencement of the abortion, the dissent's next contention also fails. The dissent argues that a doctor can never violate the Act when he intends at the outset to perform a standard D&E because at that point "he is not 'aware that it is practically certain that his conduct will cause [the proscribed] result.'" *Post* at 43 (quoting Model Penal Code § 2.02(2)(b)(ii) and citing *Carhart II*, 127 S. Ct. at 1631-32). But the "practically certain" test is only relevant to infer intent on the part of the actor once a statute's intent requirement attaches. The Virginia Act's intent requirement only attaches to the doctor's actions after intact delivery to an anatomical landmark. Thus, lack of certainty at the outset is irrelevant to the doctor's liability. At the point the intent requirement does attach — after delivery to a landmark — the doctor *is* practically certain that completing extraction will result in an act causing fetal demise, thus leading to a violation of the Virginia Act. *Compare Carhart II*, 127 S. Ct. at 1631-32 (describing how, because the Federal Act requires intentional intact delivery, the relative infrequency of accidental intact deliveries precludes the inference of intent and resulting liability onto a doctor beginning a standard D&E).

Third, the dissent argues that the Act constitutionally prohibits a doctor from undertaking a deliberate act after the fetus has been completely removed intact from the woman's body. *Post* at 36-37, 47-49. The dissent's argument is irrelevant to this case. Dr. Fitzhugh and RMCW do not challenge the Act's constitutionality in the exceedingly rare circumstance when (in a D&E) a fetus is entirely intact after complete removal, the district court did not decide such a claim, and the Commonwealth does not raise any argument against such a

claim on appeal. In fact, the Commonwealth contradicts the dissent by recognizing that "[o]n those occasions when Dr. Fitzhugh is able to remove the fetus intact during a D&E abortion procedure, he does not engage in any act to kill the fetus [or violate the Act] once it is removed from the body of the mother." Appellants' Br. 23.

Finally, the dissent complains that our analysis "ignor[es] explicit language and undertak[es a] course to find ambiguity in the Virginia Act so as to be able to strike it down," thus "violat[ing] established rules of statutory construction." *Post* at 45. But, as we have demonstrated, it is the dissent that ignores the Act's language and finds ambiguity where none exists. The express terms of the Act are susceptible to only one construction: that doctors performing standard D&Es face liability when the fetus emerges substantially intact and completing extraction causes fetal demise. Because the Act does not suffer from ambiguity, it cannot be remedied through the application of the rule of lenity or the cannon of constitutional avoidance. *See Carhart II*, 127 S. Ct. at 1631 ("[T]he cannon of constitutional avoidance does not apply if a statute is not 'genuinely susceptible to two constructions.'" (quoting *Almendarez-Torres v. United States*, 523 U.S. 224, 238 (1998))); *see also Ratzlaf v. United States*, 510 U.S. 135, 148 (1994) ("[W]ere we to find [the statute] ambiguous . . . we would resolve any doubt in favor of the defendant."). Further, the presumption of scienter only applies when a criminal statute lacks any intent requirement. *See Staples v. United States*, 511 U.S. 600, 605 (1994)(applying presumption when the statute is "silent concerning the *mens rea* required for a violation"). Here, the Act includes an intent requirement, which criminalizes intentionally performing an act to cause fetal demise at a specific point in delivery. We may not ignore the legislature's deliberate choices and impute an additional intent requirement into the Act, thereby creating a entirely new element — the intentional commencement of an intact D&E — for the crime of "partial birth infanticide."

In its attempt to force the Virginia Act into constitutional bounds, the dissent strays far from the text. The dissent declares — without a discernible basis — that the Virginia legislature intended to prohibit intact D&E, just as the Federal Act does. The dissent then proceeds to make exceedingly complicated arguments that do not come to grips with the plain language of the Virginia Act. In the end, the dissent

fails in its effort to square the Virginia and the Federal Acts. For there is no argument that can obfuscate the simple fact that the Virginia Act employs different language than the Federal Act, thereby prohibiting different conduct. The Virginia Act, on its face, lacks both the intent and the distinct overt act requirements found crucial to the constitutionality of the Federal Act. The Virginia Act's exceptions are limited. As a result, the Virginia Act unconstitutionally criminalizes the standard D&E because a doctor performing such a procedure cannot know at the outset whether he will accidentally violate the Act.

D.

It is undisputed that all doctors who set out to perform standard D&E abortions — the most common second trimester method — may accidentally deliver the fetus to an anatomical landmark. The record evidence supporting this fact is not "hypothetical" or "speculative," *e.g.*, *post* at 54, 46; it is based on the firsthand experience and knowledge of the witnesses in this case. The record further contradicts the dissent's contention that the Commonwealth's experts state that accidental intact delivery "never occurs." *Post* at 55. Witnesses for both sides testified that it is impossible to predict the point at which the fetus will disarticulate during a D&E. As a result, the fetus will sometimes emerge to an anatomical landmark, regardless of the doctor's intent at the outset. Dr. Fitzhugh testified that in his practice a fetus accidentally emerges past an anatomical landmark in a small fraction of his cases each year. The Commonwealth agrees that a fetus sometimes accidentally emerges to an anatomical landmark during a standard D&E, Appellants' Supplemental Reply Br. 6. The Supreme Court has also accepted this fact as established. *Carhart II*, 127 S. Ct. at 1632.

A doctor faced with the unintentional delivery of a fetus to an anatomical landmark usually causes fetal demise simply by taking the steps necessary to complete the abortion, specifically, applying traction to the fetus that results in disarticulation or compressing the fetal skull to dislodge it from the cervix. Despite the dissent's claim, it is not "a *very* rare event" for the fetal skull to become lodged. *Post* at 55. As the Supreme Court has stated, "after 16 weeks . . . the fetal skull becomes too large to pass through the cervix." *Carhart I*, 530 U.S. at 927; *see also Carhart II*, 127 S. Ct. at 1621-22 (describing

how, "[i]n the usual intact D&E" — when the cervix is dilated more than in a standard D&E — "the fetus' head lodges in the cervix, and dilation is insufficient to allow it to pass"). Furthermore, there is no "medical uncertainty" in the record about the methods for removing a lodged fetal skull from the cervix. *Post* at 57 (quoting *Carhart II*, 127 S. Ct. at 1637) (quotation and alteration omitted). As we have explained, it is undisputed that a doctor will have to collapse the fetal skull in this situation. *See supra* at 9 & n.1.

Indeed, *Carhart II* thoroughly discredits the dissent's repeated assertion that our concern is based on a "hypothetical" situation. There, the Supreme Court recognized that, in reality, a standard D&E sometimes results in accidental delivery to an anatomical landmark. *See Carhart II*, 127 S. Ct. at 1632 ("A fetus is only delivered intact in a small fraction of the overall number of D&E abortions."). According to the Court, the Federal Act is constitutional precisely because it does not criminalize accidental intact D&Es. The Court's focus on accidental intact D&E not only discredits the dissent's contention that this event is hypothetical, it also highlights the central importance of avoiding liability for doctors who encounter such an event.[5]

---

[5]The dissent also states that RMCW's expert, Charles DeProsse, M.D., "suggested" that there was no need to perform an overt act when the fetus passes through the cervix head first. *Post* at 57. This contention is irrelevant because Dr. Fitzhugh does not argue he would have to commit an overt act in the rare situations in which the fetus is delivered entirely intact. The dissent simply fails to recognize that it is far more common for the fetal skull to become lodged or for the fetus to disarticulate during delivery. *See Carhart II*, 127 S. Ct. at 1622.

The dissent further cites statements made by the Commonwealth's expert witnesses to dispute the occurrence of accidental intact D&E. *Post* at 55 n.2. The dissent, however, focuses on the witnesses' legal conclusions rather than their testimony about the medical subjects on which they were proffered as experts. For instance, although John W. Seeds, M.D., stated that he could not think of a situation when a doctor would have to violate the Act, he also testified that when the fetal skull becomes lodged during a D&E, there is no reliable method for removing the fetus intact and alive, as the doctor must compress the skull. Similarly, Dr. Giles agreed that "there's no way for a physician to predict or control" the point at which a fetus disarticulates during removal. J.A. 444. In other words, Dr. Giles agreed that a fetus could accidentally emerge intact to an anatomical landmark and that disarticulation could thereafter occur, regardless of the doctor's intent.

Because the doctor violates the Virginia Act when a standard D&E results in an accidental intact delivery and he must then perform an act causing fetal demise, he subjects himself to the risk of criminal liability at the outset of every standard D&E. The only way for a doctor to avoid this risk is to refrain from performing all standard D&E procedures. As a result, the Virginia Act imposes an undue burden upon a woman's right to choose a previability second trimester abortion. The Act is therefore unconstitutional.

## IV.

Finally, we consider the Commonwealth's arguments that the plaintiffs cannot mount a facial challenge to the Virginia Act on grounds of overbreadth.

The Commonwealth first contends that we may not consider the constitutionality of the Act because *Carhart II* forecloses all facial challenges alleging overbreadth in statutes regulating abortion. We disagree. In *Carhart II* the Court entertained just such an overbreadth challenge. The Court explained that the challenge was based on the Federal Act's "operation and effect," and the issue could be resolved by "[a] straightforward reading of the Act's text." *Id.* at 1627. After careful consideration of the terms of the Federal Act, the Court concluded that the Federal Act did not impose an undue burden through overbreadth because it did not "prohibit the vast majority of D&E abortions." *Id.* at 1632. Even though the *Carhart II* plaintiffs failed to demonstrate that the Federal Act was overly broad, the decision confirms that an overbreadth challenge can be mounted against an abortion regulation.

In contrast to its consideration of the overbreadth claim, the *Carhart II* Court disapproved the use of a facial challenge in the context of the separate objection to the Federal Act for its lack of a health exception. *Id.* at 1638-39. "In these circumstances," the Court stated, "the proper means to consider exceptions is by an as-applied challenge." *Id.* at 1638. An as-applied challenge

> is the proper manner to protect the health of the woman if
> it can be shown that in discrete and well-defined instances
> a particular condition has or is likely to occur in which the

procedure prohibited by the Act must be used. In an as-
applied challenge the nature of the medical risk can be better
quantified and balanced than in a facial attack.

*Id.* at 1638-39. *Carhart II* thus limited its requirement for an as-
applied challenge to this specific context. In sum, *Carhart II* does not
question the established validity of facial challenges to abortion stat-
utes. *See Sabri v. United States*, 541 U.S. 600, 609-10 (2004) (citing
*Carhart I*, 530 U.S. at 938-46); *Casey*, 505 U.S. at 895; *see also
Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323 (6th Cir.
2007), *cert. denied*, ___ S. Ct. ___, 2008 WL 59328 (Jan. 7, 2008)
(applying *Carhart II* to hold a Michigan abortion ban unconstitutional
on its face).

The Commonwealth argues further that even if a facial challenge
is allowed here, the plaintiffs must satisfy the "no set of circum-
stances" burden for overbreadth challenges set forth in *United States
v. Salerno*, 481 U.S. 739, 745 (1987). In *Salerno*, a case challenging
a pretrial detention statute, the Court said that a plaintiff mounting a
facial attack "must establish that no set of circumstances exists under
which the Act would be valid." *Salerno*, 481 U.S. at 745. We are not
bound to use the *Salerno* standard, and our reason is simple: the
Supreme Court has not adopted this standard in the abortion context.
In *Casey*, decided after *Salerno*, the Court struck down an abortion
statute after concluding that it would be unconstitutional "in a large
fraction of cases in which [the statute] is relevant." *Casey*, 505 U.S.
at 895 (opinion of the Court). After *Casey* the Court in *Carhart I* held
an abortion statute unconstitutional on its face without any mention
of *Salerno* or its standard. *Carhart I*, 530 U.S. at 938-46; *see also
Sabri*, 541 U.S. at 609-10 (citing *Carhart I* in confirming that over-
breadth challenges are allowed in the context of abortion regulation).
And, most recently, the Court in *Carhart II* declined to endorse the
"no set of circumstances" standard, stating that the debate about the
proper burden need not be resolved. 127 S. Ct. at 1639. The *Carhart
II* Court went on to apply *Casey*'s standard rather than *Salerno*'s,
holding that the plaintiffs were unable to "demonstrate[ ] that the
[Federal] Act would be unconstitutional in *a large fraction of relevant
cases*." *Id.* at 1639 (citing *Casey*, 505 U.S. at 895) (emphasis added).

Contrary to the dissent's assertion, this circuit has not squarely
confronted the question of *Salerno*'s applicability to a claim alleging

an undue burden on a woman's access to abortion, the claim at issue in this case. The dissent argues, nevertheless, that our application of the *Salerno* standard in *Greenville Women's Clinic v. Commissioner, South Carolina Department of Health and Environmental Control*, 317 F.3d 357 (4th Cir. 2002), is controlling. In that case, however, we did not analyze whether the regulation (an abortion clinic licensing scheme) imposed an undue burden on a woman's access to abortion. *Id.* at 361. Instead, we analyzed whether the challenged regulation violated procedural due process under *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). *Id.* at 361-63. In fact, in an earlier decision, when our court did consider whether the same regulation imposed an undue burden, we noted disagreement about the proper standard for facial challenges asserting undue burden, reserved the question, and held that the regulation survived under any of the standards advanced. *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 164-65 (4th Cir. 2000). Our other cases addressing the proper standard for the undue burden analysis likewise declined to decide what standard applied. *See Planned Parenthood of the Blue Ridge v. Camblos*, 155 F.3d 352, 359 n.1 (4th Cir. 1998) (en banc); *see also id.* at 381 n.14 (stating that discussion of *Salerno* standard in *Manning v. Hunt*, 119 F.3d 254 (4th Cir. 1997), was dicta); *Manning*, 119 F.3d at 268 n.4 (noting that the issue of *Salerno*'s applicability is "not now properly before the Court").

Prior to *Carhart II* seven circuits, based on analysis of the relevant Supreme Court cases, had concluded that *Salerno* does not govern facial challenges to abortion regulations. *See Cincinnati Women's Servs., Inc. v. Taft*, 468 F.3d 361, 367-69 (6th Cir. 2006) (citing cases). Nothing in *Carhart II* or in our circuit precedent prevents us from reaching the same conclusion. *See Richmond Med. Ctr. for Women*, 409 F.3d at 627-28. This conclusion is the correct one, we believe, in light of *Carhart II*, *Carhart I*, and *Casey*, none of which adopt the *Salerno* standard. Accordingly, we hold that *Salerno*'s "no set of circumstances" standard does not apply in the context of a facial challenge, like the one here, to a statute regulating a woman's access to abortion. *See Casey*, 505 U.S. at 895.

The Commonwealth argues finally that regardless of the plaintiffs' burden, the Virginia Act is not subject to a facial challenge because accidental intact D&Es only occur in a small fraction of cases.

According to the Commonwealth, the unconstitutional application of the Act in such limited circumstances does not create an undue burden on a woman's right to choose an abortion. The Commonwealth's argument misses the mark.

A doctor attempting in good faith to comply with the Virginia Act will accidentally violate the Act in a small fraction of cases. But the doctor never knows prior to embarking on any standard D&E procedure whether a violation will occur. Thus, *every time* a doctor sets out to perform a standard D&E, he faces the unavoidable risk of criminal prosecution, conviction, and imprisonment under the Virginia Act. In short, the only way that a doctor could avoid criminal liability is to avoid performing D&E abortions altogether. The Act thus effectively prohibits *all* D&E procedures, which comprise the overwhelming majority of second trimester abortions. As a result, we are compelled to conclude that the Virginia Act imposes an undue burden on a woman's right to choose an abortion. *See Carhart II*, 127 S. Ct. at 1627, 1632, 1637; *Carhart I*, 530 U.S. at 945-46; *Casey*, 505 U.S. at 878-79; *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 75-79 (1976).

### V.

In sum, the Virginia Act is susceptible to only one construction, and we cannot avoid the constitutional implications of that construction. *See Carhart II*, 127 S. Ct. at 1631. As we have demonstrated, the Virginia Act differs from the Federal Act in two key ways. First, the Virginia Act does not require that a doctor intend to perform an intact D&E at the outset of the abortion procedure for a violation to occur; it thus allows criminal liability to be imposed on a doctor who sets out to perform a standard D&E when the fetus accidentally emerges to an anatomical landmark. Second, the Act does not require an overt fatal act distinct from delivery, thereby imposing criminal liability on a doctor performing a standard D&E when the completion of delivery causes fetal demise after a fetus reaches an anatomical landmark. Thus, a doctor performing a standard D&E cannot predict whether he will violate the Act. As a result, the Act on its face effectively prohibits all standard D&Es, imposing an undue burden on a woman's right to choose an abortion before fetal viability. Because this defect infects the entire Act, partial invalidation is not an option. Any remedy short

of declaring the Act invalid would require us to rewrite its very core, and that is a task that must be left to the legislature. *See Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-30 (2006).

We therefore affirm the district court's ruling that declares the Virginia Act unconstitutional on the ground that it imposes an undue burden on a woman's constitutional right to choose a (previability) second trimester abortion. We likewise affirm the permanent injunction against enforcement of the Act. We recognize, of course, that Virginia may enact a statute that prohibits certain abortion procedures, such as the intact D&E, so long as the statute complies with the limits imposed by the Constitution. *Carhart II* provides the Commonwealth with further (and important) guidance.

*AFFIRMED*

NIEMEYER, Circuit Judge, dissenting:

In *Gonzales v. Carhart*, 550 U.S. ___, 127 S. Ct. 1610 (2007), the Supreme Court held that the federal partial-birth abortion statute is constitutional. Because the federal statute is like Virginia's partial birth infanticide statute, the Supreme Court granted Virginia's petition for a writ of certiorari in this case, vacated our judgment holding Virginia's statute unconstitutional, and remanded this case back to us for reconsideration in light of *Gonzales v. Carhart. See Herring v. Richmond Med. Ctr. for Women*, 127 S. Ct. 2094 (2007). With a troubling opinion, the majority now seeks to circumvent the Supreme Court's ruling in *Gonzales v. Carhart*, unwittingly inviting the Supreme Court to spell out in this case that Virginia's statute is likewise constitutional, because in the nature and scope of conduct prohibited, it is virtually identical to the federal statute upheld as constitutional in *Gonzales v. Carhart*.

In 2003, the Commonwealth of Virginia enacted a law (the "Virginia Act") making it a criminal offense to "kill[ ] a human infant" by "knowingly perform[ing] partial birth infanticide." Va. Code Ann. § 18.2-71.1(A). The Virginia Act applies to protect only a living fetus that has been delivered halfway into the world — i.e., either "the infant's entire head is outside the body of the mother" or, for a breech

delivery, "any part of the infant's trunk past the navel is outside the body of the mother." *Id.* § 18.2-71.1(D). It defines a "partial birth infanticide" as "any deliberate act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed." *Id.* § 18.2-71.1(B).

Also in 2003, Congress passed the federal Partial-Birth Abortion Ban Act of 2003 (the "Federal Act"), 18 U.S.C. § 1531, which criminalizes the same conduct — *no more and no less*. It makes it a criminal offense to "kill[ ] a human fetus" by "knowingly perform[ing] a partial-birth abortion." 18 U.S.C. § 1531(a). As with the Virginia Act, the Federal Act applies to protect only a living fetus that has been delivered halfway into the world — i.e., either "the entire fetal head is outside the body of the mother" or, for a breech delivery, "any part of the fetal trunk past the navel is outside the body of the mother." *Id.* § 1531(b)(1)(A). And as with the Virginia Act, the Federal Act defines a "partial-birth abortion" to mean "deliberately and intentionally vaginally deliver[ing] a living fetus . . . for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus and perform[ing] the overt act, other than completion of delivery, that kills the partially delivered living fetus." *Id.* § 1531(b)(1).

Before *Gonzales v. Carhart*, a divided panel of our court struck down the Virginia Act on a facial challenge because the Act did not contain "an exception for circumstances when the banned abortion procedures are necessary to preserve a woman's health." *Richmond Med. Ctr. for Women v. Hicks* (*Hicks II*), 409 F.3d 619, 629 (4th Cir. 2005). But shortly after we decided *Hicks II*, the Supreme Court upheld the Federal Act, finding it constitutional against that same attack. *Gonzales v. Carhart*, 127 S. Ct. at 1635-38 (rejecting a challenge based on the absence of an exception to preserve a woman's health). In light of its finding the Federal Act constitutional, the Supreme Court vacated our decision in *Hicks II* and directed that we reconsider it in light of *Gonzales v. Carhart*.

For a second time, the majority conducts a facial review of the Virginia Act, and again it holds the Act unconstitutional. This time, the

majority rationalizes the slightly different word structure in the Virginia Act to create a statute with a meaning materially different from the Federal Act and, indeed, different from the plain language of the Virginia Act. The majority concludes now that the Virginia Act imposes criminal liability on a doctor "who sets out to perform a standard D&E [abortion] that *by accident* becomes an intact D&E [abortion]." *Ante* at 4 (emphasis added). It does so even though the Virginia Act's *mens rea* requirement is effectively *identical* to that of the Federal Act. Because the majority believes that the Virginia Act exposes doctors to liability for "accidental" violations, it concludes that the Virginia statute imposes an undue burden on a woman's right to obtain a late-term abortion (during the second trimester) because doctors will not perform such abortions for fear of criminal liability under the Virginia Act. Thus, despite the Supreme Court's holding in *Gonzales v. Carhart*, which finds a virtually identical statute constitutional, the majority again holds that the Virginia Act is unconstitutional.

Its holding, I submit, is based on a glaring misreading of both the Virginia Act and the Supreme Court's decision in *Gonzales v. Carhart*.

As I demonstrate, the majority's effort to distinguish the *mens rea* requirement of the Virginia Act from that in the Federal Act amounts to little more than an isolated consideration of an extraction of language from the Virginia Act, taken out of context. Contrary to the majority's reading, the Virginia Act prohibits only the *knowing* performance of a "partial birth infanticide," which is defined to include only *deliberate* acts to kill the human infant. Moreover, the Act explicitly excludes from its coverage the standard D&E abortion procedure, but the majority nonetheless contorts the statute to assume that such procedure is criminalized when it accidentally leads to an intact D&E abortion.

In addition, the majority conducts a facial review of the Virginia Act on the very basis rejected by the Supreme Court in *Gonzales v. Carhart*, where the Court observed that the respondents had failed to demonstrate that the Federal Act would be unconstitutional "in a large fraction of relevant cases" and rejected any facial challenge that was based on only "potential situation[s] that might develop." *Gonzales v.*

*Carhart*, 127 S. Ct. at 1639. The majority opinion rests on a hypothetical factual circumstance that is not contemplated by the Virginia Act — a legal standard D&E procedure that "accidentally" results in the delivery of an intact fetus — and that, according to plaintiff's own witnesses, occurs only rarely or, according to Virginia's witnesses, never occurs. An analysis based on hypotheticals of the type relied on by the majority violates the express instructions of *Gonzales v. Carhart* for conducting facial challenges.

Finally, the majority, consisting of only two judges of our court, impermissibly overrules existing Fourth Circuit precedent which holds that in addressing a facial challenge of an abortion regulation, we must apply the standard stated in *United States v. Salerno*, 481 U.S. 739 (1987). *See McMellon v. United States*, 387 F.3d 329, 332-33 (4th Cir. 2004) (holding that only an *en banc* court may overrule an earlier panel decision).

Accordingly, as in our earlier decision, *see Hicks II*, 409 F.3d at 629-46 (Niemeyer, J., dissenting), I again profoundly dissent.

I

Virginia's Act to prohibit partial birth infanticide was enacted in 2003, to take effect July 1, 2003. Two weeks before it was to take effect, Dr. William Fitzhugh, a board-certified obstetrician and gynecologist who performs abortions in Virginia, and the organization he directs, the Richmond Medical Center for Women (hereinafter collectively, "Dr. Fitzhugh"), commenced this action as a facial challenge to the constitutionality of the Virginia Act and to enjoin its enforcement before it was to take effect. No existing medical case formed the basis for Dr. Fitzhugh's suit. Rather, his challenge of the Virginia Act was purely a facial one, based on the generalities of his abortion practice. He speculated that the Virginia Act would apply to prohibit a fraction — indeed, as he concedes, a small fraction — of the abortions he could expect to perform.

As the Supreme Court observed in *Gonzales v. Carhart*, the vast majority — 85 to 90% — of the approximately 1.3 million abortions performed in the United States annually are completed in the first three months of pregnancy. 127 S. Ct. at 1620. The Virginia Act regu-

lates none of these first-trimester abortions. Most of the remaining abortions take place in the second trimester and are performed through a class of methods medically referred to as "dilation and evacuation," the standard procedure which we refer to as a "standard D&E," as did the Supreme Court. *See Gonzales v. Carhart*, 127 S. Ct. at 1620-21; *Stenberg v. Carhart*, 530 U.S. 914, 924 (2000); *see also Richmond Med. Ctr. v. Hicks* (*Hicks I*), 301 F. Supp. 2d 499, 503 (E.D. Va. 2004) (noting that the standard D&E "is the most common method of pre-viability second-trimester abortion, accounting for approximately 96% of all second-trimester abortions in the United States").

The standard D&E procedure, which is not covered by either the Virginia Act or the Federal Act, begins with the doctor dilating the woman's cervix through the use of intracervical osmotic dilators and, in some instances, medicines such as misoprostol. *Gonzales v. Carhart*, 127 S. Ct. at 1620-21. The extent of dilation under this procedure varies by patient and by the type and degree of treatment administered. *Id.* Although the doctor cannot be certain in advance exactly how much dilation will occur, when he uses more osmotic dilators for a longer period of time he will generally produce greater dilation. In this manner, a doctor exerts at least some degree of control over the amount of dilation. *Id.* ("In general the longer dilators remain in the cervix, the more it will dilate. Yet the length of time doctors employ osmotic dilators varies. Some may keep dilators in the cervix for two days, while others use dilators for a day or less"). Once sufficient dilation is achieved, the doctor sucks the amniotic fluid from the uterus, which begins the extraction of fetal tissue and fetal parts. *Hicks I*, 301 F. Supp. 2d at 504. The doctor then inserts forceps into the uterus and grasps the fetus to pull it through the cervical opening and out of the woman. *Gonzales v. Carhart*, 127 S. Ct. at 1621; *Hicks I*, 301 F. Supp. 2d at 504. The traction of the fetus against the cervix as a result of the doctor's pulling causes that part of the fetus to be torn apart from the fetus' body. *Hicks I*, 301 F. Supp. 2d at 504; *see also Gonzales v. Carhart*, 127 S. Ct. at 1621 ("For example, a leg might be ripped off the fetus as it is pulled through the cervix and out of the woman"); *Stenberg v. Carhart*, 530 U.S. at 925-26. The doctor continues to grasp and remove the remaining fetal parts until the entire dismembered fetus is removed from the woman's body. "A doctor may make 10 to 15 passes with the forceps to evacu-

ate the fetus in its entirety, though sometimes removal is completed with fewer passes." *Gonzales v. Carhart*, 127 S. Ct. at 1621. Thus, in the standard D&E procedure, dismemberment of the fetus occurs while the fetus is still inside the woman's body.

Neither the Virginia Act nor the Federal Act prohibits or regulates a standard D&E. Indeed, Virginia's Act explicitly excludes the procedure from its regulation. *See* Va. Code Ann. § 18.2-71.1(B).

In contrast to the standard D&E procedure is a variation referred to as the "intact D&E," which the Virginia Act calls "partial birth infanticide," and the Federal Act calls a "partial-birth abortion." In the intact D&E, the doctor dilates the cervix to a greater extent so that the fetus may be pulled through the cervical opening whole and intact, not being dismembered inside the woman's body. *See Gonzales v. Carhart*, 127 S. Ct. at 1621-22; *Hicks I*, 301 F. Supp. 2d at 505. In order to achieve the greater dilation, the doctor uses up to 25 osmotic dilators for up to two full days. *See Gonzales v. Carhart*, 127 S. Ct. at 1621. Once sufficient dilation has occurred, the doctor "extracts the fetus in a way conducive to pulling out its entire body, instead of ripping it apart." *Id.* at 1622. This is done with different procedures, depending on the fetus' presentation. In the head-first presentation, the doctor first collapses the fetus' head to allow it to pass through the cervical opening and then delivers the fetus intact. *Stenberg v. Carhart*, 530 U.S. at 927. In a breech position, the doctor delivers the fetus' body through the cervical opening up to the point that the doctor has access to the fetus' head. *Id.*; *Gonzales v. Carhart*, 127 S. Ct. 16 1622. Because the fetus' head is usually too large to pass through the cervical opening, the doctor squeezes the head with forceps or punctures it with scissors and suctions out the head's contents in order to collapse the head so that the fetus can be delivered intact. *Gonzales v. Carhart*, at 1622-23.

To challenge the Virginia Act, Dr. Fitzhugh assumed that he will be presented with either of two rare circumstances during a standard D&E. Under the first circumstance, the fetus unexpectedly emerges completely from the woman without any parts becoming dismembered. In that circumstance, Dr. Fitzhugh complained that he would then have to destroy the fetus outside of the mother in violation of the

Virginia Act, because "my ultimate job on any given patient is to terminate that pregnancy, which means that I don't want a live birth."

Under the second circumstance, he complained that in less than 0.5% of his D&E procedures, the fetus is presented in a breech position with the head of the fetus becoming lodged in the woman's cervix. In that circumstance, even though the fetus is delivered beyond the anatomical landmarks of the Virginia Act, he claimed that he would have to crush the skull or collapse it by sucking out its contents to complete the delivery of the fetus. In doing that he observed that he again would violate the Virginia Act.

With respect to Dr. Fitzhugh's first hypothetical circumstance, the Commonwealth of Virginia agrees that Dr. Fitzhugh would violate the Virginia Act because the live, intact fetus is protected by the Act. But, the Commonwealth points out, at that point — when the living fetus has been fully delivered into the world — no abortion right under the Constitution is implicated. With respect to Dr. Fitzhugh's second hypothetical, the Commonwealth's expert witnesses contend that no medical authority exists to support the need to crush the lodged fetal skull and that other medical methods to extract the intact fetus are available, such as additional dilation.

Shortly after Dr. Fitzhugh filed his suit, the district court granted his motion for a preliminary injunction against enforcement of the Virginia Act. And following discovery, the court granted his motion for summary judgment, invalidating the Virginia Act as violating the Due Process Clause of the Fourteenth Amendment. *See Hicks I*, 301 F. Supp. 2d at 512-17. To find the Virginia Act facially unconstitutional, the district court concluded that (1) the Act lacked an exception for preservation of the woman's health; (2) its ban on an intact D&E procedure placed an undue burden on a woman's right to an abortion; (3) its exception for preservation of the woman's life was inadequate; (4) it criminalized D&E abortions without a compelling state interest; and (5) it was unconstitutionally vague. *Id.* In reaching its decision, the district court also excluded testimony of the Commonwealth's expert witnesses, Dr. Harlan Giles and Dr. John Seeds, concluding that Dr. Giles was inconsistent and unreliable and that Dr. Seeds was not an expert on abortions and was unreliable. *Id.* at 511-12.

A divided panel of this court affirmed the district court's decision and held that the Virginia Act was unconstitutional because it lacked a health exception for the woman. *See Hicks II*, 409 F.3d at 626. Construing *Stenberg v. Carhart* to require *any and all* bans on partial birth abortions to contain an exception for the health of the woman, the majority invalidated the Virginia Act for its facial omission of such a health exception. *See id.* at 622-26.

The Supreme Court granted the Commonwealth's petition for a writ of certiorari, vacated our opinion in *Hicks II*, and remanded the case for further consideration in light of the Supreme Court's decision in *Gonzales v. Carhart*. *See Herring v. Richmond Med. Ctr. for Women*, 127 S. Ct. 2094 (2007). In *Gonzales v. Carhart*, the Supreme Court rejected a facial attack on the Federal Act similar to that mounted against the Virginia Act. Like the Virginia Act, the Federal Act outlaws intact D&E abortions and provides no exception for the woman's health, only for the preservation of the woman's life. *Gonzales v. Carhart*, 127 S. Ct. at 1635. The Court nonetheless upheld the Federal Act because, unlike the record in *Stenberg v. Carhart*, the record compiled by Congress and by the district court showed medical uncertainty over whether making intact D&E abortions unavailable would ever create significant health risks. *Id.* at 1635-37. Additionally, the Court found that the Federal Act, unlike the Nebraska statute in *Stenberg v. Carhart*, does not prohibit standard D&E procedures. *Id.* at 1629-32.

Despite the similarity of the Virginia Act to the Federal Act, the majority now focuses on what it sees as several differences in the language structure between the two Acts in order to continue to assail the Virginia Act as violating the Constitution. Through a crabbed and, I submit, untenable reading of the Virginia Act, the majority fails to recognize that the Virginia Act and the Federal Act prohibit *identical conduct* with the same *mens rea*. The holding in *Gonzales v. Carhart* thus requires that we uphold the constitutionality of the Virginia Act.

II

I begin by demonstrating that the Federal Act and the Virginia Act are not materially different and that therefore the constitutionality of the Virginia Act is governed by *Gonzales v. Carhart*.

First, the Virginia Act, like the Federal Act, was intended to prohibit only partial birth abortions — abortions in which a live fetus, delivered to an anatomical landmark, is killed. Both the Virginia Act and the Federal Act prohibit conduct consisting of (1) "the delivery of a living fetus"; (2) "delivery of a living fetus to one of these 'anatomical "landmarks"'" — the head or the navel; and (3) "an 'overt act, other than completion of delivery, that kills the partially delivered living fetus.'" *Gonzales v. Carhart*, 127 S. Ct. at 1627 (quoting 18 U.S.C. § 1531(b)(1)(B)); *cf.* Va. Code Ann. § 18.2-71.1 (prohibiting the same conduct, but using phrases (1) "human infant who has been born alive, but who has not been completely extracted or expelled," (2) "entire head is outside the body of the mother, or . . . any part of the infant's trunk past the navel," and (3) "deliberate act that . . . is intended to kill" the fetus, and excluding from criminalization "completing delivery of a living human infant").

Specifically, the Virginia Act and the Federal Act both require scienter for criminal liability to attach. The Virginia Act criminalizes the *knowing* performance of "partial birth infanticide," Va. Code Ann. § 18.2-71.1(A), which is defined as

> any *deliberate* act that (i) is intended to kill a human infant who has been born alive, but who has not been completely extracted or expelled from its mother, and that (ii) does kill such infant, regardless of whether death occurs before or after extraction or expulsion from its mother has been completed.

*Id.* § 18.2-71.1(B) (emphasis added). The Virginia Act thus includes a scienter requirement with language that varies only slightly from the Federal Act, which defines "partial-birth abortion" as "deliberately and intentionally vaginally deliver[ing] a living fetus" past certain anatomical landmarks "for the purpose of performing an overt act that the person knows will kill the partially delivered living fetus; and perform[ing] the overt act, other than completion of delivery, that kills the partially delivered living fetus." 18 U.S.C. § 1531(b)(1)(A), (B).

The object of protection under both the Federal Act and the Virginia Act is a live fetus that is delivered to an anatomical landmark,

and the landmarks are the same. Under the Federal Act, they are defined as follows:

> [I]n the case of a head-first presentation, the entire fetal head is outside the body of the mother, or, in the case of breech presentation, any part of the fetal trunk past the navel is outside the body of the mother.

18 U.S.C. § 1531(b)(1)(A). Under the Virginia Act, they are similarly defined:

> [I]n the case of a headfirst presentation, the infant's entire head is outside the body of the mother, or, in the case of breech presentation, any part of the infant's trunk past the navel is outside the body of the mother.

Va. Code Ann. § 18.2-71.1(D).

Moreover, just as the Supreme Court in *Gonzales v. Carhart* observed that the Federal Act does not prohibit abortion methods other than the intact D&E procedure, the Virginia Act explicitly carves out the standard D&E procedure from its coverage:

> The term "partial birth infanticide" shall not under any circumstances be construed to include any of the following procedures: (i) the suction curettage abortion procedure, (ii) the suction aspiration abortion procedure, (iii) *the dilation and evacuation [D&E] abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother*, or (iv) completing delivery of a living human infant and severing the umbilical cord of any infant who has been completely delivered.

*Id.* § 18.2-71.1(B) (emphasis added). Finally, both Acts exempt any procedure necessary to preserve the woman's life. *See* 18 U.S.C. § 1531(a); Va. Code Ann. § 18.2-71.1(E). And neither Act contains a "health" exception to preserve the health of the mother.

Thus, the Federal Act, which has been judged constitutional by the Supreme Court, and the Virginia Act, which the majority endeavors

yet again to strike down as unconstitutional, criminalize precisely the same conduct — the *knowing* commission of "partial-birth abortion" or "partial birth infanticide," both of which are defined the same in the two Acts.

The majority nonetheless searches for "key differences" between the Virginia Act and Federal Act in order to hold the Virginia Act unconstitutional. Specifically, the majority cites first the Federal Act's "scienter requirements concerning all the actions involved in the prohibited abortion," *ante* at 14, and reads the Virginia Act to lack equivalent scienter elements. The majority finds that the Virginia Act's only intent requirement is connected with its prohibiting the doctor from performing "any deliberate act that . . . is intended to kill [and does kill] a human infant who has been born alive, but who has not been completely extracted or expelled from its mother." *Ante* at 14. The majority believes that, unlike the Federal Act, the Virginia Act contains no requirement that the doctor *intend* to perform an intact D&E abortion at the outset of the procedure in order to be held criminally liable under the statute. Thus, the majority concludes, "the Virginia Act reaches doctors who intend to perform a standard D&E, but who nonetheless accidentally deliver the fetus to an anatomical landmark, and who must perform a deliberate act that causes fetal demise in order to complete removal." *Ante* at 15. Here, the majority strains to interpret the Virginia Act in a way that allows it to strike the Act down, and here, the majority's reasoning is demonstrably wrong.

First, the Virginia Act *explicitly states*, in no uncertain terms, that "[t]he term 'partial birth infanticide' shall not under any circumstances be construed to include [a standard D&E abortion]," defined as "the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother." Va. Code Ann. § 18.2-71.1(B). If the risk of liability from performing a standard D&E abortion is the sole difference between the Virginia Act and the Federal Act, then the Virginia Act's explicit exemption of that procedure provides the same protection as the Federal Act's scienter requirement. Indeed, the Virginia Act explicitly directs that we are not to "construe[ ]" the statute to ban the standard D&E procedure "*under any circumstances*." *Id.* (emphasis added). Rationalizing its position to strike down the statute, the majority argues that in some "accidental" and exceedingly rare circumstances, what began as a

standard D&E may end up falling within the terms of the statute's ban. By interpreting the statute this way, the majority wholly ignores the Virginia legislature's clear direction that we are *not* to so "construe[ ]" the statute to prohibit a standard D&E abortion "under any circumstances." *Id.*[1]

In addition, the majority ignores the provision of the Virginia Act which provides that a doctor violates the Act only if he "*knowingly* performs partial birth infanticide." Va. Code Ann. § 18.2-71.1(A) (emphasis added). He must therefore know that what he is performing is a partial birth infanticide, a concept which under the statute clearly does not include a standard D&E abortion. *See id.* § 18.2-71.1(B). Even if the explicit exemption were not included in the Virginia Act, the scienter requirement that the doctor "*knowingly* perform[ ] partial birth infanticide" prevents liability from attaching. "This follows from the general principle that where scienter is required no crime is committed absent the requisite state of mind." *Gonzales v. Carhart*, 127 S. Ct. at 1628. The difference between the intact D&E abortion procedure and the standard D&E abortion procedure depends on the intent and approach of the doctor in *commencing* the delivery and the degree of dilation sought to be achieved. *See id.* at 1621-22, 1632. As a result, the Virginia Act can be read to attach liability only when the

---

[1]The majority worries that because the Virginia Act excludes "the dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the mother," the exception applies only to standard D&E abortions in which the doctor is able to complete the procedure as intended, dismembering the fetus prior to its removal from the woman.

But the Virginia Act's statement "involving the dismemberment of the fetus prior to removal from the body of the mother" serves only as a *descriptive* term, explaining that the exclusion applies to the standard D&E and not to the intact D&E. In fact, both the majority and the Supreme Court describe the conduct prohibited by the Federal Act with the *same* language, stating that the Federal Act "prohibits a doctor from intentionally performing an intact D&E," but "does not prohibit the [standard] D&E procedure *in which the fetus is removed in parts*," *Gonzales v. Carhart*, 127 S. Ct. at 1629 (emphasis added); *ante* at 11, even though it is obvious that both the Supreme Court and the majority read the Federal Act not to criminalize the *accidental intact* D&E abortion, if such occurs.

doctor (1) *knowingly commences* an intact D&E abortion procedure *and* (2) performs the "deliberate act" to kill the fetus after it has emerged to the anatomical landmarks. As a doctor attempting to perform a standard D&E abortion does not know that he will ultimately perform an intact D&E abortion, he does not violate the Virginia Act.

Moreover, it can never be, under the Virginia Act, that a doctor who starts out intending to perform a standard D&E abortion is "knowingly perform[ing] partial birth infanticide" because when he sets out to perform the exempted procedure, he is not "aware that it is practically certain that his conduct will cause [the proscribed] result." Model Penal Code § 2.02(2)(b)(ii); *see also Gonzales v. Carhart*, 127 S. Ct. at 1631-32. Since, by definition, "partial birth infanticide" does not include the standard D&E procedure, a doctor setting out to perform a standard D&E could not possibly "know" at the outset that he is performing "partial birth infanticide," even if the ultimate result is that such an intact D&E abortion occurs.

In response to this plain reading of the Virginia statute, the majority repeatedly asserts, without statutory support, that the Virginia Act's "intent requirement only *attaches after the fetus has been delivered* to an anatomical landmark, so it does not distinguish between doctors who intend at the outset to perform standard D&Es and those who intend at the outset to perform intact D&Es." *Ante* at 19; *see also ante* at 15. This observation, again, fails to recognize that the Virginia Act prohibits a doctor from "*knowingly*" performing a partial birth infanticide and *explicitly exempts* the standard D&E procedure under all circumstances. *See* Va. Code Ann. § 18.2-71.1(B) (stating that the term "partial birth infanticide" is not to include the standard D&E procedure "under any circumstances"). This is significant in terms of the intent required by the statute because the standard D&E procedure is defined by the intent of the doctor *when he commences the procedure*, a point the majority overlooks. As the Supreme Court made clear in *Gonzales v. Carhart*, a doctor performing a standard D&E has the intent at the outset to perform an abortion "in which the fetus would not be delivered to either of the . . . anatomical landmarks." *Id.* at 1631. Both the Supreme Court's understanding of late-term abortion procedures and our record reveal that the difference in the procedures, to a large extent, turns on the steps a doctor takes *at the outset of the procedure*. Indeed, the Supreme Court stated that "*an intact*

*delivery is almost always a conscious choice rather than a happenstance.*" *Id.* at 1632 (emphasis added). Because whether a doctor performs a standard D&E turns on the doctor's intent at the outset, when a doctor has the intent at the start of the procedure "to perform a D&E in which the fetus would not be delivered to either of the Act's anatomical landmarks," *id.* at 1631, the doctor does not violate the statute. Thus, under the Virginia Act the *mens rea* attaches at the outset, contrary to the majority's unsupported assertion.

In short, the Virginia Act is properly read to have the same scienter requirements as the Federal Act.

The majority also argues that the Virginia Act and Federal Act are different because, although the Federal Act and the Virginia Act both require a doctor to perform a "deliberate" or "overt" act to cause fetal demise after delivery to an anatomical landmark, the Federal Act requires that this act be distinct from completing delivery, while the Virginia Act, as the majority reads it, does not. The majority finds that the Federal Act's requirement of an "overt act, other than completion of delivery" operates to exclude from criminal liability standard D&E abortions in which the fetus dies as a result of disarticulation or dismemberment that occurs *during delivery*, because the Federal Act requires an act, *in addition to delivery*, such as compressing the fetal skull, before liability can attach. But the majority believes that under the Virginia Act, a doctor is criminally liable when he *completes delivery* of the fetus after it has emerged substantially intact, if disarticulation or dismemberment (causing fetal demise) occurs accidentally during this process.

Again, the distinction made by the majority is not supported by the language of the Virginia Act. In the Virginia Act, a "'partial birth infanticide' means any deliberate act that (i) is intended to kill a human infant who *has been born* alive." Va. Code Ann. § 18.2-71.1(B) (emphasis added). The use of the present perfect tense indicates that the live birth, as defined in subsection (C) of the Virginia Act, must have taken place *prior* to the "deliberate act" which kills the fetus. Thus, the Virginia Act requires a specific overt act to kill the "human infant who *has been born* alive," and that act must be performed *after* the infant has reached the anatomical landmark specified by the statute. Moreover, the Virginia Act has the exact same excep-

tion for "completion of delivery" as the Federal Act, despite the majority's argument that it does not. The Virginia Act explicitly states that "[t]he term 'partial birth infanticide' *shall not under any circumstances be construed to include . . . completing delivery of a living human infant* and severing the umbilical cord of any infant who has been completely delivered." Va. Code Ann. § 18.2-71.1(B) (emphasis added).

The majority argues that "an act (such as disarticulation) that causes fetal demise can not occur *during* delivery for the [completion of delivery] exception to apply," because the statute requires that the infant be living at the completion of delivery, *ante* at 20, and thus the exception would not protect the doctor when, in attempting to complete delivery, the fetus is ripped apart prior to being "completely delivered." *See* Va. Code Ann. § 18.2-71.1(B)(iv). This, however, overlooks the Virginia Act's requirement that the doctor perform a "deliberate act" that is "*intended* to kill a human infant." *Id.* at § 18.2-71.1(B) (emphasis added). A doctor who intended to complete intact delivery did not "*intend*[ ] to kill a human infant," even if, ultimately, the infant is removed from the woman in pieces and dies. The majority's argument is again based on a misreading of the Virginia Act.

Accordingly, under the Virginia Act, a doctor who did not set out to perform an intact D&E abortion does not violate the Virginia Act even if the fetus, after emerging to an anatomical landmark, disarticulates, because (1) the standard D&E exception contained in the Virginia Act protects him, (2) the act of "completing delivery" is excluded from the definition of "partial birth infanticide," and (3) he did not commit an overt act "intended to kill a human infant" after the "infant . . . has been born alive."

In ignoring explicit language and undertaking its course to find ambiguity in the Virginia Act so as to be able to strike it down, the majority violates established rules of statutory construction, such as the rule of lenity which requires that criminal statutes be construed in favor of the criminal defendant. *See Ratzlaf v. United States*, 510 U.S. 135, 148 (1994); *McBoyle v. United States*, 283 U.S. 25, 27 (1931); *United States v. Wiltberger*, 18 U.S. (5 Wheat.) 76, 95-96 (1820). In addition, the majority's interpretation fails to accommodate the common law presumption of scienter — that criminal statutes are pre-

sumed to contain sufficient scienter requirements to separate innocent conduct from unlawful conduct. *See Staples v. United States*, 511 U.S. 600, 605-07 (1994); *Morissette v. United States*, 342 U.S. 246, 264-65 (1952). Finally and most egregiously, the majority's construction tramples the principle of constitutional avoidance — that if a statute can be fairly construed to avoid serious constitutional questions, it is appropriate to do so. "'[T]he elementary rule is that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.'" *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Constr. Trades Council*, 485 U.S. 568, 575 (1988) (quoting *Hooper v. California*, 155 U.S. 648, 657 (1895)); *see also NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500 (1979); *Int'l Ass'n of Machinists v. Street*, 367 U.S. 740, 749 (1961); *Crowell v. Benson*, 285 U.S. 22, 46, 62-63 (1932); *Ashwander v. TVA*, 297 U.S. 288, 346-48 (1936) (Brandeis, J., concurring); *accord United States v. X-Citement Video, Inc.*, 513 U.S. 64, 78 (1994) (reading scienter element into statute because "[c]ases . . . suggest that a statute completely bereft of a scienter requirement . . . would raise serious constitutional doubts"). Thus, the majority's efforts to find ambiguity for the purpose of striking down a statute violate longstanding principles of statutory construction.

At bottom, there is simply no basis for finding a material distinction between the Virginia Act and the Federal Act. The Virginia Act contains both intent and overt act requirements, as does the Federal Act, and accordingly, the Supreme Court's holding in *Gonzales v. Carhart*, finding the Federal Act constitutional, likewise renders the Virginia Act constitutional.

## III

Apart from its argument that there is a material distinction between the Acts' *mens rea* requirements, the majority still worries about the highly infrequent or even speculative circumstance where a doctor, who sets out to perform a standard D&E abortion, *might accidentally* deliver the fetus to an anatomical landmark. In the majority's view, as that doctor completes the abortion by stabbing or squeezing the fetus' skull, he subjects himself to the risk of criminal liability under the Virginia Act even though he set out to perform a standard D&E abortion. The majority claims that "[t]he only way for a doctor to

avoid this risk is to refrain from performing all standard D&E procedures," and, as a result, it reasons that the Virginia Act imposes an undue burden upon a woman's right to choose a previability second trimester abortion. *Ante* at 27.

The same argument was made in *Gonzales v. Carhart* and rejected by the Supreme Court not only because the *mens rea* requirement would not be satisfied, *see* 127 S. Ct. at 1632, but also because the legislative evidence indicates that the majority's hypothetical is entirely speculative. As the Court explained:

> The evidence also supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery. . . . And intact D&E is usually described as involving some manner of serial dilation. . . . Doctors who do not seek to obtain this serial dilation perform an intact D&E on far fewer occasions. *See, e.g.*, *Carhart* [*v. Ashcroft*], 331 F. Supp. 2d [805], 857-858 [D. Neb. 2004] ("In order for intact removal to occur on a regular basis, Dr. Fitzhugh would have to dilate his patients with a second round of laminaria"). This evidence belies any claim that a standard D&E cannot be performed without intending or foreseeing an intact D&E.

*Id.* (relying on testimony of the plaintiff in that case, Dr. William Fitzhugh, who is also the plaintiff in this case).

Even if a doctor has an intellectual concern about this risk, he need *not* refrain from performing all D&E abortions in order to protect himself. The doctor who might conceivably face the risk of accidental intact delivery of a fetus to an anatomical landmark can *always* protect himself from criminal liability. Because of this, even without the protection of the double scienter elements contained in the Virginia Act, the Act must be found constitutional.

The Virginia Act contains a life exception that allows for the use of *any procedure* to save the life of the mother "so long as the physician takes every medically reasonable step, consistent with such pro-

cedure, to preserve the life and health of the infant." Va. Code Ann. § 18.2-71.1(E). Accordingly, when by accident or fortuity a fetus emerges intact to an anatomical landmark, a doctor can always protect himself from criminal liability by attempting, *from that point forward*, to take reasonable steps to complete a live delivery. If he is unsuccessful, he nonetheless is protected by the language that he took medically reasonable steps to preserve the fetus. If, on the other hand, he is successful in completing the live delivery, he incurs no liability so long as he thereafter performs no deliberate act to kill the infant now born alive. Thus, even if the Virginia Act did not contain a knowledge element regarding commencement of the procedure or delivery, the doctor could still always protect himself from criminal liability if the procedure did not follow his intended course.

Dr. Fitzhugh argues that "requiring" a live birth in such circumstances would conflict with a doctor's original purpose in commencing the abortion — to kill the fetus in the course of terminating the pregnancy. This, however, is not an unconstitutional result because the ability to choose abortion in any and all circumstances is not an unqualified right. It is well established that "the State has legitimate interests from the outset of the pregnancy in protecting the health of the woman and the life of the fetus that may become a child," even taking into account the "recognition of the right of the woman to choose to have an abortion before viability and to obtain it without undue interference from the State." *Gonzales v. Carhart*, 127 S. Ct. at 1626 (quoting *Planned Parenthood of Southeastern Pa. v. Casey*, 505 U.S. 833, 846 (1992)). "Regulations which do no more than create a structural mechanism by which the State, or the parent or guardian of a minor, may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose." *Casey*, 505 U.S. at 877 (opinion of O'Connor, Kennedy, and Souter, JJ.). The Virginia Act, like the Federal Act, "proscribes a method of abortion in which a fetus is killed just inches before completion of the birth process," or indeed after a live delivery. *Gonzales v. Carhart*, 127 S. Ct. at 1632-33. Whether the fetus is intact inches before completion of the birth process by intent or by accident, the resulting harm of not prohibiting its destruction is the same: "Implicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and

innocent human life, making it increasingly difficult to protect such life." Partial-Birth Abortion Ban Act of 2003, Pub. L. No. 108-105, § 2(14)(N), 117 Stat. 1201, 1206 (congressional findings), quoted in *Gonzales v. Carhart*, 127 S. Ct. at 1633. The Supreme Court, in *Gonzales v. Carhart*, found that a State's interest in protecting and ensuring respect for human life, and safeguarding the reputation of the medical profession, applies differently for standard D&E procedures and intact D&E procedures in which the fetus is destroyed after reaching anatomical landmarks. A State has a *greater* interest in prohibiting intact D&E abortions, and in protecting the life and health of a fetus that has partially entered this world, because of the "brutal and inhumane" nature of the procedure. *See Gonzales v. Carhart*, 127 S. Ct. at 1632-35. The Court explained:

> Partial-birth abortion, as defined by the [Federal] Act, differs from a standard D&E because the former occurs when the fetus is partially outside the mother to the point of one of the Act's anatomical landmarks. It was reasonable for Congress to think that partial-birth abortion, more than standard D&E, "undermines the public's perception of the appropriate role of a physician during the delivery process, and perverts a process during which life is brought into the world."

*Gonzales v. Carhart*, 127 S. Ct. at 1634-35 (citing Partial-Birth Abortion Ban Act of 2003, Pub. L. No. 108-105, § 2(14)(K), 117 Stat. 1201, 1205 (congressional findings)).

Accordingly, even before the infant is delivered alive — when it is almost fully brought into the world — the Supreme Court has found the State's interests in preserving the sanctity of life to be greater than in the case where the fetus is killed before it has substantially entered the world intact. Whether these distinctions make sense, or indeed whether both abortion methods are equally brutal, is not the question to contemplate in applying controlling law, as a standard D&E abortion has been judged permissible. But the Supreme Court has found that a State's interest in the life of a human fetus is increased when that fetus is substantially expelled from the woman carrying it.

As a result, requiring a doctor — in situations that occur *very* rarely, if ever — to attempt to complete delivery and, if he so

chooses, to allow the infant to expire on its own, is not an undue bur-
den on a woman's right to choose to have an abortion, nor does it sub-
ject any doctor to the possibility of unintentional and unchecked
criminal liability. Perhaps a doctor cannot fully predict when an infant
will emerge to an anatomical landmark intact, but the doctor *can*
always control his actions in those exceedingly rare situations when
this occurs and thus avoid criminal penalties in every case.

Moreover, if the woman's life is in danger, the doctor can always
take any steps necessary to save her. The Virginia Act explicitly
states: "This section shall not prohibit the use by a physician of any
procedure that, in reasonable medical judgment, is necessary to pre-
vent the death of the mother." Va. Code Ann. § 18.2-71.1(E). As Dr.
Fitzhugh testified:

> Q:   So would you agree with me that if you had the — if
>      you did not complete the delivery in the scenario you
>      just described [where the head was lodged in the cer-
>      vix] — you know, you said collapsing the skull or
>      whatever other means — *that the woman's life would
>      be at risk*? Do you agree with that?
>
> A:   Yes sir.

Thus, the only situation in which a doctor might be faced with per-
forming an "accidental" intact D&E is one in which the woman's life
is at risk and therefore in which the procedure is authorized, provided
that the doctor first takes all reasonable steps, from that point on, to
preserve the health and life of the fetus.

The majority argues that "[a]pplying the life exception in the man-
ner suggested [by the Commonwealth] would render the Virginia Act
largely meaningless by permitting the very procedure the Act was
meant to prohibit: an intact D&E where, after a substantially intact
delivery, the doctor must compress the fetal skull to remove the
fetus." *See ante* at 19. This argument, however, misses the mark. For
several reasons, the life exception does *not* provide a loophole
through which all intact D&E abortions can become legal. First, as
discussed above, the Virginia Act contains the very same scienter
requirement as does the Federal Act, requiring intent to perform an

intact D&E abortion from the commencement of the procedure. Such intent could be proved in a criminal trial through evidence regarding the actions of the doctor, such as the amount of dilation he sought, testimony of nurses and other witnesses present during the procedure, and information provided to the woman prior to the procedure, among, surely, many other things. And if the necessary intent is proven, then the life exception cannot prevent criminal liability from attaching, because the doctor performed the procedure with the required preexisting *mens rea*, not due to a reasonable medical judgment to prevent the mother's death.

Second, even if the Virginia Act were read without the same *mens rea* requirements as the Federal Act, an intact D&E abortion still would not be permitted until the doctor makes reasonable efforts — whatever those encompass — to preserve the health and life of the fetus should the rare situation that the majority fears occur.

The majority asserts, in response, that the record yields but one conclusion as to the reasonable efforts a doctor can take from this point forward: "when the fetal skull becomes lodged in the cervix, the doctor must collapse the skull to complete the procedure." *Ante* at 19-20. But with this statement the majority grossly mischaracterizes the record. Dr. Harlan Giles' affidavit, for example, clearly states that if the fetal head were to become lodged in a woman's cervix, "it is unsafe to crush the fetal skull with instrumentation," and that "in such a situation, including those cases where the life of the woman is threatened, it is much safer to administer Terbutaline or nitroglycerine to the patient to facilitate immediate, additional cervical dilation." (J.A. 288-29.) Not only is crushing the fetal skull not the *only* option, but in fact it may be the most dangerous one.

The majority further argues that under my reasoning (that even without a dual intent requirement a doctor can protect himself under the Virginia Act), "a doctor would be allowed to deliver (intentionally or unintentionally) a fetus until its skull becomes lodged; at this point both the Act's prohibition and its life exception would begin to apply; and the life exception would immediately cancel out the prohibition, allowing the doctor to deliberately collapse the skull to complete the abortion." *Ante* at 19. Tellingly, the majority's argument here acknowledges that a doctor can, at least to some degree, control what

happens from the inception of the procedure — if he could not, there would be no difference between a doctor who "intentionally" delivers a fetus to an anatomical landmark and one who does so "unintentionally." Setting that aside, the requirement that a doctor take steps to preserve the life of the infant means that the Virginia Act does not allow a doctor to perform this *intentional* intact D&E, as the majority fears, because the doctor must — from the point that the fetal head becomes lodged in the cervix — make all efforts to save the life of the infant (while, of course, also making all efforts to save the life of the woman). A doctor would not do this when performing the criminalized intentional intact D&E. It may be that this fetus ultimately dies — but it is consistent with the Supreme Court's expressed views of the sanctity of life that, from the point the fetus has emerged into the world largely intact, we must respect it. *See Gonzales v. Carhart*, 127 S. Ct. at 1634-35 (finding it a reasonable viewpoint that an intact D&E, which "occurs when the fetus is partially outside the mother to the point of one of the Act's anatomical landmarks," more than the standard D&E, "perverts a process during which life is brought into the world") (internal quotation marks and citation omitted).

In a reaching attempt to further confuse the statute's reader, the majority appears troubled that the Virginia Act's life exception does not protect the doctor when the fetus accidentally disarticulates while he attempts to complete delivery, and that the completion of delivery exception does not apply when the doctor faced with an accidental intact D&E compresses the fetal skull lodged in the woman's cervix. But the majority's distinction is again illusory. As I have shown, when a fetus accidentally disarticulates while a doctor attempts to complete delivery, the doctor is protected by the exception for completion of delivery. Thus, he does not need to be protected by the life exception. And if the fetal skull becomes lodged in the cervix and the doctor has made all efforts to complete a live birth, the doctor can do what he needs to remove the fetus in order to save the life of the woman; he has protection under the life exception and does not need protection under the completion of delivery exception. Again, the majority's selective reading of the statute is glaring.

The majority worries still that the completion of delivery exception applies only when the doctor completes delivery *and* severs the umbilical cord, and therefore, that if the umbilical cord accidentally

is severed in the process of delivery, the doctor becomes automatically criminally liable. The complete absence of support in the record for the contention that the doctor is likely to unintentionally sever the umbilical cord when completing delivery reveals, once again, the problem with the majority's attempt to strike down the statute based on a hypothetical factual record — here, based on a scenario created entirely by the majority's imagination. Moreover, a doctor who attempts to complete delivery, even if the fetus accidentally disarticulates and the umbilical cord is accidentally severed, would still not violate the statute because he would not have taken a deliberate act that was "*intended* to kill a human infant." Va. Code Ann. § 18.2-71.1(B).

In short, the majority's belief — that "[t]he only way for a doctor to avoid [the risk of criminal liability when a doctor sets out to perform a standard D&E and accidentally delivers the fetus to an anatomical landmark] is to refrain from performing all standard D&E procedures," *see ante* at 27 — is demonstrably wrong. And the majority's assertion that "[t]he express terms of the [Virginia] Act are susceptible to only one construction: that doctors performing standard D&Es face liability when the fetus emerges substantially intact and completing extraction causes fetal demise," *ante* at 24, is simply a false statement. It fails to recognize the explicit language of the Virginia Act that *excludes* standard D&E abortions from the statute's coverage altogether and that the statute imposes criminal punishment only for the "*knowing*" performance of a partial birth infanticide and the "*deliberate act . . . intended* to kill a human infant who has been born alive." Va. Code Ann. § 18.2-71.1(B). In basing its holding that the Virginia Act is unconstitutional on such demonstrably wrong premises, the majority flaunts "[t]he elementary rule . . . that every reasonable construction must be resorted to, in order to save a statute from unconstitutionality." *Gonzales v. Carhart*, 127 S. Ct. at 1631 (internal quotation marks omitted).

IV

Virginia contends, in light of *Gonzales v. Carhart*, that the district court erred in the first instance by hearing the facial attack on the Virginia Act, arguing that an as-applied challenge is instead the appropriate mechanism for raising the concerns that Dr. Fitzhugh has about

the Virginia Act's constitutionality. The Commonwealth argues alternatively that if we entertain the facial challenge, regardless of which standard is adopted for conducting a facial challenge, Dr. Fitzhugh cannot satisfy it.

The majority dismisses the Commonwealth's argument that a facial challenge is not appropriate here, finding that *Gonzales v. Carhart* did not foreclose all facial challenges alleging overbreadth in statutes regulating abortion, but only a facial challenge based on the Federal Act's lack of a health exception. Such a narrow take on the Supreme Court's analysis, however, is rejected by the Court's explicit language. In any event, I agree with the Commonwealth that no matter what standard for conducting a facial challenge is applied — whether it be the "no-set-of-circumstances" standard of *Salerno*, 481 U.S. at 745, or the "large-fraction-of-the cases" standard discussed in *Casey*, 505 U.S. at 895 — Dr. Fitzhugh cannot satisfy either standard with the hypothetical factual circumstances that he posits.

In *Gonzales v. Carhart*, the Supreme Court noted that whatever standard for conducting a facial challenge should apply, the plaintiff would, regardless, have to satisfy at least the more relaxed standard of *Casey*, by "demonstrat[ing] that the Act would be unconstitutional in *a large fraction* of relevant cases." 127 S. Ct. at 1639 (emphasis added). The Court thus limited its scope of facial review to provisions governing "all instances in which the doctor proposes to use the prohibited procedure, not merely those in which the woman suffers from medical complications." *Id.* As the Court explained:

> It is neither our obligation nor within our traditional institutional role to resolve questions of constitutionality with respect to each potential situation that might develop. It would indeed be undesirable for this Court to consider every conceivable situation which might possibly arise in the application of complex and comprehensive legislation.

*Id.* (internal quotation marks omitted). The Court made clear that the judicial preference is for "[a]s-applied challenges [as they] are the basic building blocks of constitutional adjudication." *Id.* (internal quotation marks omitted) (first alteration in original). This preference was only recently reiterated with yet greater force when the Court

admonished against basing a facial challenge on "hypothetical" or "imaginary" cases. *See Wash. State Grange v. Wash. State Republican Party*, 552 U.S. ___, 128 S. Ct. 1184, 1190-91 (2008) (observing also that facial challenges are "disfavored").

Despite these prescriptions, the majority proceeds to strike down the Virginia Act based on only "potential situations that might develop." *See Gonzales v. Carhart*, 127 S. Ct. at 1639 (finding such an approach to be inappropriate). This is especially egregious here, where unconstitutionality can be found only with respect to a hypothetical case that, according to Dr. Fitzhugh, only very rarely occurs and, according to the Commonwealth's witnesses, never occurs.[2]

As the facial challenge in this case is built on a hypothetical case that is not contemplated by the Act and occurs only rarely, it should never have been heard. The majority invalidates the Virginia Act solely because it believes that in a potential case — a standard D&E abortion that accidentally presents the opportunity for prohibited conduct — the Virginia Act *might* violate the Constitution.

The majority's opinion illustrates well the problem with facial challenges. Indeed, its selective consideration of an entirely hypothetical case is its most glaring fallacy. It rests its principal arguments on the hypothetical possibility that a doctor, intending to perform a standard D&E, accidentally delivers the fetus intact until the fetus' skull becomes lodged during a breech delivery, concededly a *very* rare event. At the same time, it rejects an argument based on what it calls

---

[2]Dr. Seeds stated in his affidavit that "[e]ven if the health concerns raised by . . . Dr. Fitzhugh were medically valid, there is no clinical scenario I can imagine where a physician would have to resort to a procedure that violated Virginia Code § 18.2-71.1." (J.A. 286). Dr. Giles stated in his affidavit that "it is very rare for the fetal head to become lodged in the cervical os during a D&E," and that if this occurs, the doctor has a number of options, such as administering Terbutaline or nitroglycerine to the patient to facilitate immediate, additional cervical dilation. The doctor would never face, as the majority's hypothetical case requires, the sole option of crushing the fetal skull. In fact, such an act would be "unsafe," creating "an undue risk of perforation or damage to the uterus and cervix." (J.A. 288-89).

the rare event that a fetus could be delivered intact, stating that Dr. Fitzhugh does not challenge the Act's constitutionality "when (in a D&E) a fetus is entirely intact after complete removal." *Ante* at 23. This cherry-picking highlights the problem for facial challenges in a context where the record has no medical case at issue. We are not free to speculate as to what *might* happen in one particular circumstance in order to craft a reason to strike down the statute.

In addition, the majority specifically ignores our circuit standard for conducting a facial challenge. It states: "We are not bound to use the *Salerno* standard [requiring plaintiffs to satisfy the "no set of circumstances" burden for overbreadth challenges], and our reason is simple: the Supreme Court has not adopted this standard in the abortion context." *Ante* at 28. Yet the majority fails to recognize three cases in which we applied the *Salerno* standard with respect to our review of abortion statutes. *See Greenville Women's Clinic v. Commiss'r*, 317 F.3d 357, 362 (4th Cir. 2002); *Greenville Women's Clinic v. Bryant*, 222 F.3d 157, 164-65 (4th Cir. 2000); *Manning v. Hunt*, 119 F.3d 254, 268-69 (4th Cir. 1997). In *Greenville Women's Clinic v. Commissioner*, we reviewed a state regulation for licensing abortion clinics that the plaintiffs had contended placed an "undue burden" on a woman's decision whether to seek an abortion, and we stated, "We begin by emphasizing, as we did in *Bryant I*, that the challenge to Regulation 61-12 is a facial one and therefore 'the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid.'" 317 F.3d at 362 (quoting *Salerno*, 481 U.S. at 745).

It is well established in our circuit that one panel cannot overrule the decision of another. *See McMellon v. United States*, 387 F.3d 329, 332 (4th Cir. 2004) ("A number of cases from this court have stated the basic principle that one panel cannot overrule a decision issued by another panel"). Yet, by ignoring panel decisions that establish *Salerno* as the governing standard in our circuit for facial challenges of abortion regulations, the majority purports to do just that.

Regardless of which standard is applied, however — whether from *Salerno* or from *Casey* — the Virginia Act survives even the most lenient standard for a facial challenge. Under the *Casey* standard, Dr. Fitzhugh would have to show that the Virginia Act would be uncon-

stitutional "in a large fraction of the cases in which [the statute] is relevant." 505 U.S. at 895. Yet, by his own estimation, the accidental partial birth infanticide would occur rarely. Indeed, the Supreme Court stated that the evidence "belies" such a circumstance:

> The evidence also supports a legislative determination that an intact delivery is almost always a conscious choice rather than a happenstance. Doctors, for example, may remove the fetus in a manner that will increase the chances of an intact delivery. And intact D&E is usually described as involving some manner of serial dilation. Doctors who do not seek to obtain this serial dilation perform an intact D&E on far fewer occasions. This evidence belies any claim that a standard D&E cannot be performed without intending or foreseeing an intact D&E.

*Gonzales v. Carhart*, 127 S. Ct. at 1632 (internal citations omitted).

The medical evidence *in this case* follows that presented in *Gonzales v. Carhart*, where Dr. Fitzhugh was also a plaintiff, and here too it fails to support the notion that delivery beyond the Act's anatomical landmarks is ever both (1) accidental and (2) unavoidable. At best, it can be said that it is very rare for the fetal head to become lodged in the woman's cervix during a standard D&E. Moreover, one of the plaintiffs' medical experts, Dr. Charles DeProsse, stated that though "several factors determine how the procedure will progress," "a skilled physician will adapt his or her technique in light of the individual patient's needs." Dr. DeProsse's uncontradicted affidavit suggested that when the fetus appears in the cervix head first and passes the anatomical landmarks, there is never a need to perform an overt act to kill it, as it can simply be removed from the woman intact. Moreover, in the rare event that the fetus is presented in breech position and its skull becomes lodged in the cervix, the doctor has options short of performing an overt act to kill the fetus, thereby avoiding liability under the Act. The doctor can wait for further dilation; he can administer a drug to dilate the cervix to a greater extent; or he can compress, but not crush, the head of the fetus. While these methods may not be universally agreed to, "[m]edical uncertainty does not foreclose the exercise of legislative power in the abortion context any

more than it does in other contexts." *Gonzales v. Carhart*, 127 S. Ct. at 1637.

As a result, there is no evidence in the summary judgment record suggesting either the existence or inevitability of the speculated "accidental" intact D&E abortion. To the extent that such a circumstance *might* arise in a rare case, the doctor has adequate alternatives so as to preclude a finding on a facial challenge that the statute is unconstitutional in "a large fraction" of the cases to which it is relevant. Even under the majority's rare hypothetical, the Virginia Act would be constitutional. We should thus reject the district court's facial review of the Virginia Act.

V

Because the majority concludes that the Virginia Act is facially unconstitutional, it does not address to any significant extent Virginia's contention that the district court stacked the factual deck against the Commonwealth by improperly excluding from consideration important evidence that would have supported even further the constitutionality of the statute and that placed any factfinding by the district court deeper in doubt. In particular, Virginia contends that the district court erred in (1) striking the testimony of Virginia's expert, Dr. Harlan Giles; (2) striking portions of the testimony of Virginia's other expert, Dr. John Seeds; and (3) excluding testimony given before the United States House of Representatives Committee on the Judiciary during hearings on the Federal Act.

In my dissent in the original opinion in this case, I addressed the evidentiary issues in some detail. *See Hicks II*, 409 F.3d at 642-45 (Niemeyer, J., dissenting). Here, I rest on my earlier analysis and only briefly reiterate why the district court's evidentiary rulings were in error.

Virginia proffered the testimony of Dr. Harlan Giles, an obstetrician and gynecologist specializing in maternal and fetal medicine, to support several parts of its defense, including the proposition that equally safe alternatives to any procedure banned by the statute exist. The district court struck all of Dr. Giles' testimony, finding it to be "unreliable because it [was] inconsistent and incoherent." *Hicks I*, 301

F. Supp. 2d at 510. In particular, the district court found that Dr. Giles' testimony on particular points contradicted testimony that he had given in a prior lawsuit. The court relied primarily on this inconsistency to disqualify Dr. Giles.

It is of course well established that under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), a district court has an obligation to "ensure that any and all scientific testimony . . . is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Although the Supreme Court in *Kumho Tire* considered the inconsistency of an expert's testimony as a factor in not certifying the expert, the Court's overriding concern in that case was the unreliability of the method used by the expert. *Kumho Tire*, 526 U.S. at 157. In contrast, here, the apparent inconsistencies in Dr. Giles' testimony, which constituted the district court's main reason for its exclusion, were inconsistencies between testimony given by Dr. Giles in this case and the testimony he gave in an earlier case, and the district court did not explore the reasons for any differences.

The district court also supported its decision to exclude Dr. Giles' testimony with its conclusion that one method Dr. Giles advocated for completing an abortion in which the fetus' head became lodged in the woman's cervix fell below the accepted standard of care. To reach this conclusion, however, the district court ignored the testimony of Dr. Fitzhugh's own expert, who indicated that Dr. Giles' method would not in fact be a breach of the standard of care.

Finally, the district court supported its decision to strike the testimony of Dr. Giles by noting that Dr. Giles could not point to any medical literature to support his theory that cervical muscle relaxants could be used to dislodge a fetal head that had become lodged during a standard D&E procedure. Disqualifying Dr. Giles on this basis is particularly troubling because Dr. Fitzhugh's experts similarly failed to support several of their opinions with documented medical authority, yet the court chose to rely on them. The court's rejection of Dr. Giles' testimony for that reason created a double standard and was an abuse of discretion.

The district court also struck portions of the testimony of Virginia's other witness, Dr. John Seeds, based on a finding that Dr. Seeds was

an expert on neither abortions nor D&E abortion procedures. The district court concluded solely from the fact that Dr. Seeds did not perform abortions that his testimony in this matter would be unreliable. But as an OBGYN expert in maternal/fetal medicine, Dr. Seeds knew more about the female anatomy, pregnancy, and birth than the average juror. In fact, Dr. Seeds, as an expert in maternal/fetal medicine, might actually have been more qualified to render an opinion than Dr. Fitzhugh's experts, neither of whom had expertise in maternal/fetal medicine. As a maternal/fetal medicine specialist, Dr. Seeds had extensive training in the management of high-risk pregnancies, which made him qualified to speak to possible complications occurring during pregnancy that could necessitate the types of procedures banned by the Virginia Act.

The district court and the majority would seem to have us exclude *all* testimony of doctors who choose not to perform intact D&E abortions, accepting as valid only the opinions of those who do choose to perform these abortions. But such an approach is nonsensical. Doctors who believe that an intact D&E is never medically necessary will, necessarily, never perform the procedure. By excluding the testimony of doctors who fully understand maternal/fetal medicine and the female anatomy, and as a result never perform an intact D&E, a record in this type of case can *never* contain evidence that the intact D&E abortion procedure is not medically necessary, even if this is true.

The exclusion of Dr. Seeds' testimony is so highly irregular that it is difficult for me to conceive of the motive for the district court's ruling. In any event, I believe it clear that the district court abused its discretion in excluding Dr. Seeds' testimony.

Finally, the district court excluded parts of the Congressional Record for the Federal Act as evidence that such a ban would not endanger a woman's health. This exclusion covered all parts of the Congressional Record, including the House Committee Report and the congressional testimony of Dr. Mark Neerhof, an OBGYN professor at Northwestern University Medical School. Specifically, the district court found that the report was "political" and "untrustworthy" and that Dr. Neerhof's statement was hearsay.

Although it was within the district court's discretion to conclude that the Congressional Report was unreliable, the district court again applied a double standard to reach such a conclusion. In particular, the court repeatedly relied on hearsay statements made by the American College of Obstetricians and Gynecologists, which were presented by Dr. Fitzhugh. I can see no relevant difference between Dr. Neerhof's testimony before Congress and the hearsay statements made by the American College of Obstetricians and Gynecologists. If the district court chose to exercise its discretion to exclude such testimony, then it should have done so across the board. If it chose to include the testimony as legislative facts, then it should have done so uniformly. Its single-sided ruling against Virginia, however, is, I submit, unexplainable and constituted an abuse of discretion.

## VI

Because the Virginia Act criminalizes precisely the same conduct as does the statute upheld in *Gonzales v. Carhart*, I would now also uphold the Virginia Act. Once again, the choice made by the majority to strike down Virginia's partial birth infanticide statute is not compelled by the Constitution nor by any Supreme Court case. Indeed, after reading the majority's opinion, one is struck by the extensive efforts the opinion makes to conceive of a remote hypothetical factual circumstance that might exemplify its thesis that the Virginia Act prohibits more than is prohibited by the Federal Act, which the Supreme Court upheld in *Gonzales v. Carhart*. The majority's selective use of statutory language and its rationalizations represent nothing less than a strong judicial will to overturn what the Virginia legislature has enacted for the benefit of Virginia's citizens and what, in materially undistinguishable terms, the Supreme Court has upheld as constitutional. *Cf. Gonzales v. Carhart*, 127 S. Ct. at 1631 (directing that "every reasonable construction must be resorted to, in order to save a statute from unconstitutionality") (internal quotation marks omitted).

Because *Gonzales v. Carhart* requires us to uphold the constitutionality of the Virginia Act, I vote to reverse the judgment of the district court.